## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *DONALD J. SMALL, SR.,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 05-131-P-H* |
| | ) | |
| *GENERAL MOTORS* | ) | |
| *CORPORATION, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

### MEMORANDUM DECISION ON DEFENDANTS' MOTIONS TO STRIKE AND TO EXCLUDE AND RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants General Motors Corporation ("GMC"), Honeywell ASCa, Inc. ("Honeywell Canada") and Honeywell International, Inc. ("Honeywell International") seek summary judgment as to all counts against them in the instant products-liability suit arising from injuries suffered by Donald J. Small, Sr., when he was struck in the face on January 18, 2000 by a flexible-fan blade that separated from a fan assembly as he finished working under the hood of his 1979 GMC Jimmy truck. *See* Defendants' Joint Motion for Summary Judgment, etc. ("Defendants' S/J Motion") (Docket No. 38) at 1-2; Complaint (Docket No. 1).[1]  The defendants also ask the court to strike or exclude four of the plaintiff's expert witnesses: Robert Hall, David Quesnel, Ph.D., Robert Jorgensen and James Oddy. *See* Defendants' Motion To Strike Plaintiff's Proposed Expert Witness Robert Hall ("Motion To Strike") (Docket No. 33) at 1; Defendants' Joint Motion To Exclude the Expert Testimony of David

---

[1] The plaintiff sued GMC, Honeywell International, AlliedSignal, Inc. a/k/a Allied-Signal, Inc. and Allied Signal Canada, Inc.  *See* Complaint at 1.  In answering the Complaint, Honeywell International and Honeywell Canada represented that Honeywell International was formerly known as Allied-Signal, Inc. or AlliedSignal, Inc., and that Honeywell Canada was formerly known as AlliedSignal Canada, Inc.  *See* Answer and Affirmative Defenses of Defendants Honeywell International. Inc. and Honeywell ASCa, Inc. (Docket (*continued on next page*)

Quesnel, Ph.D./P.E., Robert Jorgensen and James Oddy, etc. ("Motion To Exclude") (Docket No. 42) at 4.  For the reasons that follow, I (i) grant the defendants' motion to strike Hall,(ii) grant in part and deny in part their motion to exclude insofar as it concerns Oddy and deny it insofar as it concerns Jorgensen and Quesnel, and (iii) recommend that their summary-judgment motion be granted as to all counts against Honeywell International and otherwise denied.

## I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)

---

No. 12) at 1.  Thus, there effectively are three defendants in this case: GMC, Honeywell International and Honeywell Canada.

(citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he

court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## II.  Factual Context

Before setting forth facts relevant to resolution of the defendants' summary-judgment motion, I turn to their ancillary motions to strike or exclude four of the plaintiff's expert witnesses, resolution of which bears on the degree to which the plaintiff's proffered facts are cognizable on summary judgment.  I also raise and address an issue concerning the manner in which the defendants have lodged objections to the plaintiff's facts.

### A.  Motion To Strike Hall

The defendants move to strike expert witness Hall on the basis of the plaintiff's failure to produce him for deposition prior to expiration of the parties' discovery deadline.  *See* Motion To Strike at 1.  The court's scheduling order, as amended on October 14, 2005, set a discovery deadline of May 18, 2006 and a deadline for the filing of dispositive/*Daubert*/*Kumho* motions of May 25, 2006.  *See* Order Granting in Part <u>19</u> Objection to Scheduling Order (Docket No. 25).[2]  After conferring with plaintiff's counsel Keith Jacques regarding scheduling, GMC's counsel served notice

---

[2] Per the court's scheduling order, motions filed pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1983), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "shall include any challenges to lack of qualifications, scope of testimony and any other issues addressed by these decisions."  Scheduling Order with incorporated Rule 26(f) Order (Docket No. 13) at 2 n.1.

on April 3, 2006 of Hall's deposition during the period April 18-21, 2006. *See* Motion To Strike ¶ 3; Plaintiff's Memorandum in Opposition to Defendant's [sic] Motion To Strike Plaintiff's Expert Witness, Robert Hall, P.E. ("Strike Opposition") (Docket No. 46) ¶ 3. On or about April 5, 2006 plaintiff's co-counsel John Ballow informed GMC's counsel that Hall would not be available until the week of May 8, 2006. *See id*. ¶ 4. The defendants said this was too late. *See* Motion To Strike ¶ 4; Strike Opposition ¶ 5.

Following further communications, on May 12, 2006 defense counsel Thomas Sweeney e-mailed Ballow:

> I still have not received a date from you for the deposition of Hall. His deposition has to be completed by next Thursday. I am now unavailable on Monday (I will be in New Jersey); Tuesday is now out because I have a video conference call at 11:00; and Wednesday I have another conference call at 3:30 but I can have someone else take it if this is the only day. Thursday morning I have a doctor appointment so perhaps we can do it that afternoon if he can be completed in 4 hours. Please let me know when next week we can depose Hall.
>
> Otherwise we will move to strike him as an expert in this case.

E-mail dated May 12, 2006 from Thomas Sweeney to John Ballow, Exh. C to Motion To Strike. On May 16, 2006 counsel for the plaintiff informed counsel for the defendants that Hall would be available to travel to Maine for the deposition on June 9, 2006 or any time thereafter, or that he could be deposed earlier if the deposition could be conducted in Alabama, where he resides. *See* Motion To Strike ¶ 6; Strike Opposition ¶ 7.

On May 18, 2006 – the deadline for completion of discovery – the plaintiff filed a motion to extend the discovery and *Daubert/Kumho*/dispositive-motion deadlines, *inter alia*, "to enable Defendants to complete the deposition of Mr. Hall within the discovery period[.]" *See* Plaintiff's Motion To Extend Scheduling Order Deadlines, etc. ("Motion To Extend") (Docket No. 30) ¶ 11. The defendants did not join in this request; on the contrary, on May 22, 2006 GMC filed an opposition to

the Motion To Extend, and all three defendants filed the instant motion to strike.  *See* Docket Nos. 32-

33.  The following day I held a teleconference with counsel for all of the parties, during which counsel

for all of the defendants voiced objection to the Motion To Extend, and I denied it.  *See* Order Denying

30 Motion To Amend Scheduling Order (Docket No. 34).  I stated:

> After extensive discussion, and finding no satisfactory explanation for (i) the plaintiff's
> late designation of its expert Robert Hall (designated March 21, 2006 following an
> extended (3 months) deadline of March 2, 2006), (ii) Mr. Hall's unavailability to be
> deposed by the defendants before the extended (3 months) discovery close deadline of
> May 18, 2006 or (iii) the plaintiff's purported need otherwise for the requested
> enlargement, I denied the motion.

*See id.*

Nothing has since transpired to alter my above-expressed views.  Hall was not deposed by the

close of the discovery deadline set forth in this court's scheduling order, and responsibility for that

default rests with the plaintiff.

Federal Rule of Civil Procedure 16(f) provides, in relevant part: "If a party or party's attorney

fails to obey a scheduling or pretrial order . . ., the judge, upon motion or the judge's own initiative,

may make such orders with regard thereto as are just, and among others any of the orders provided in

Rule 37(b)(2)(B), (C), (D)."  Fed. R. Civ. P. 16(f).  In turn, Rule 37(b)(2)(B) contemplates entry of

"[a]n order . . . prohibiting [the disobedient] party from introducing designated matters in evidence[.]"

 Fed. R. Civ. P. 37(b)(2)(B).  The First Circuit has:

> made it plain that a litigant who ignores case-management deadlines does so at his
> peril.  Consequently, when noncompliance occurs, the court may choose from a broad
> universe of possible sanctions.  This flexibility is necessary because the circumstances
> attendant to noncompliance are apt to differ widely.  In the last analysis, then, the
> choice of an appropriate sanction must be handled on a case-by-case basis.

*Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 45-46 (1st Cir. 2002) (citations and internal

quotation marks omitted).  The defendants' requested sanction – striking Hall as an expert witness – is

appropriately tailored to the plaintiff's default.  The sanction prevents the defendants from suffering

prejudice as a result of the plaintiff's non-compliance with the scheduling order, yet is not unduly broad or far-reaching.

A final point remains.  The plaintiff protests, *inter alia*, that because the defendants did not avail themselves of the court's assistance in remedying the underlying discovery dispute, they cannot now seek the extreme remedy of striking an expert witness.  *See* Strike Opposition ¶¶ 13-16; *see also, e.g., Brown v. Crown Equip. Corp.*, 236 F.R.D. 58, 61 (D. Me. 2006) ("[T]he plaintiff did not avail herself of the means available to obtain the court's assistance in obtaining the information to which she contends she was entitled at a particular time [a more detailed expert-witness disclosure].  Counsel for the plaintiff is familiar with this court's approach to discovery disputes and the fact that resolution of such disputes by the court is available on, at most, a few days' notice.  The plaintiff's failure to avail herself of this solution before filing on June 26, 2006 – less than two months before trial – a motion to strike all of the testimony of one of the defendant's expert witnesses bars her from receiving the drastic relief she now seeks.") (footnote omitted); *Wheeler v. Olympia Sports Ctr., Inc.*, No. 03-265-P-H, 2004 WL 2287759, at *2 (D. Me. Oct. 12, 2004) (denying requested discovery sanctions in case in which plaintiff's counsel chose to raise issue of assertedly flawed interrogatory responses for first time in motion to strike following close of discovery, without having previously apprised opposing counsel that issue existed or invoking aid of court to resolve it).

The instant case is distinguishable from *Brown* and *Wheeler*.  Counsel for GMC immediately put opposing counsel on notice that the request to push back the Hall deposition was problematic.  In attempting to reschedule, defense counsel warned plaintiff's counsel on May 12, 2006 that if Hall were not made available for deposition prior to expiration of the discovery deadline, the defendants would move to strike him as an expert.  *See* Exh. C to Motion To Strike.  In so doing, defense counsel placed the ball squarely in the plaintiff's court either to produce the witness prior to the close of

discovery or take his chances availing himself of the court's aid in resolving the discovery dispute prior to that time. The plaintiff did neither until, at the eleventh hour, he filed his ill-fated Motion To Extend. This is not a case, as in *Brown* and *Wheeler*, in which a party chose to lie in the weeds with a discovery dispute until it was too late for the opposing party to make meaningful reparations.

The motion to strike Hall as an expert witness accordingly is granted.

### B. Motion To Exclude Jorgensen, Oddy and Quesnel

I next take up the defendants' motion to exclude Jorgensen, Oddy and Quesnel pursuant to Federal Rule of Evidence 702, *Daubert* and *Kumho* on grounds that their testimony lacks reliability and relevance, or "fit," and that Oddy also is unqualified to proffer the opinions expressed. *See* Motion To Exclude at 4. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." *Beaudette v. Louisville Ladder, Inc*., 462 F.3d 22, 25 (1st Cir. 2006).

> With respect to reliability:

> In *Daubert,* the Supreme Court set forth four general guidelines for a trial judge to evaluate in considering whether expert testimony rests on an adequate foundation: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline. However, these factors do not constitute a definitive checklist or test, and the question of admissibility must be tied to the facts of a particular case.

*Id.* (citations and internal quotation marks omitted); *see also, e.g., Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) ("The court's assessment of reliability is flexible, but an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.") (citation and internal quotation marks omitted).

With respect to relevance, or "fit":

> [T]he *Daubert* Court imposed a special relevancy requirement. To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue. In other words, Rule 702, as visualized through the *Daubert* prism, requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citations and internal quotation marks omitted).

As the First Circuit has observed, "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (citation and internal quotation marks omitted). "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id*. (citation and internal quotation marks omitted). That said, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz-Troche*, 161 F.3d at 81 (citation and internal quotation marks omitted).

### 1.  Quesnel

Quesnel is a full professor of mechanical engineering and materials science at the University of Rochester – a position he has held since 1989. Affidavit [of David J. Quesnel, Ph.D., P.E.] ("Quesnel

Aff."), Exh. B. to Plaintiff's Opposition to Defendants' Joint Motion To Exclude Expert Testimony of

David Quesnel, P.E., Ph.D., Robert Jorgensen, P.E. and James Oddy ("Exclude Opposition") (Docket

No. 49), ¶ 1.  This is not his first exposure to the type of automotive fan at issue in this case – GMC

Part No. 336032, a so-called "flex fan" that GMC used between 1973 and 1979 on Chevrolet and

GMC light-duty trucks.  *See id*. ¶ 10; Defendants' Joint Statement of Material Facts Pursuant to Local

Rule 56(b) ("Defendants' SMF") (Docket No. 39) ¶ 4; Plaintiff's Opposition to Defendants' Statement

of Material Facts and Additional Statement of Material Facts ("Plaintiff's Opposing SMF") (Docket

No. 52) ¶ 4.  Between 1977 and the period 1996-2001 (when Quesnel performed the bulk of his

detailed analysis of the 336032 flex fan), he received $962,866 in the form of grants from various

entities given for purposes of enabling him to research fracture, deformation and fatigue related to

metals and alloys.  *See* Quesnel Aff. ¶ 10.

Quesnel's opinion, in a nutshell, is that the plaintiff's fan failed as "the result of a fatigue

failure due primarily to the design defect intrinsic to the 336-032 fan."  Report to The Ballow Law

Firm dated July 18, 2006 ("Quesnel Report,"), Exh. 6 to Quesnel Aff., at 5.  The design defect, in turn,

is that:

> [T]he 336-032 flex fan is prone to resonant vibration at the engine frequency.  This
> vibration produces amplitudes sufficient to cause fatigue failure in the 301 stainless
> steel, a hypothesis verified by calculation using data provided by GM test reports and
> confirmed by several failures I have examined where failures occurred without any
> apparent incidental damage to the blade.

*Id*. at 5-6; *see also* Examination Before Trial of David John Quesnel ("Quesnel Dep."), Exh. B to

Motion To Exclude, at 209 ("It's the same kind of thing as when the opera singer hits the high note and

it breaks the glass, because the amplitude becomes unboundingly large.").

The defendants posit that Quesnel's testimony is "junk" inasmuch as it (i) is not based on

sufficient facts or data, (ii) lacks reliability and, (iii) even if reliable, cannot reliably be applied to the

facts of this case inasmuch as the facts have been ignored.  *See* Motion To Exclude at 9-10.  They contend that:

1.      Quesnel reached his opinion by examining the fan blade for evidence of fatigue failure and then jumping to the conclusion that a defect existed, eschewing further investigation into the facts of the case and discounting as insignificant or irrelevant all evidence developed by others.  *See id.* at 5.  As a result, in the defendants' view, his opinion relies merely on his say-so, or *ipse dixit*.  *See id.*

2.      He ignored the scientific method, having (i) failed to remove the reinforcing cap on the plaintiff's flex fan to examine the fractured surface beneath it, (ii) ignored significant damage observable on the fan, including creases, crimps and kinks, (iii) admitted at deposition that "all of the damage on the fan could have caused the fan to fail[,]" (iv) shown that he essentially "knew nothing," inasmuch as he had not inspected the vehicle, believed wrongly that it had a 350 C.I.D. engine and did not know, *inter alia*, the date the fan was manufactured, whether the vehicle was originally equipped with air conditioning, the condition of the vehicle and engine, whether the vehicle had ever been involved in an accident, and whether the plaintiff's fan was properly attached to the water pump or had been operating out of balance.  *See id.* at 6-7.

3.      He further ignored the scientific method by failing to test his hypothesis, derived from converting stress-test data from GMC and Canadian Fram (the fan's manufacturer) to "strain" data, that there would be crack nucleation and the start of rapid accelerated fan failure after 16,480 miles of operation at 2,782 rpm.  *See id.* at 8-9.  Moreover, the "strain" approach is flawed, Quesnel himself having testified that "the majority of the world" employs stress analysis, early researchers who converted data from strain to stress were eliminated from the scientific literature on that topic, and he teaches his engineering students the stress approach.  *See id.* at 8.

4.      While Quesnel relies on other cases involving 336032 flex fans as proof of the merit of his theory, his approach to those cases was equally flawed.  *See id.* at 9.

These points notwithstanding, the plaintiff, relying heavily on a detailed affidavit and report of Quesnel, makes a sufficient case that his testimony satisfies both the reliability and fit standards of admissibility pursuant to Rule 702 and *Daubert/Kumho*.  *See* Exclude Opposition at 5-9; Quesnel Aff.; Quesnel Report.  This is so inasmuch as:

1.      The defendants mischaracterize Quesnel's deposition testimony concerning the strain theory, which Quesnel actually indicated was "state of the art" (rather than a flawed fringe notion). *See* Quesnel Dep. at 212-14.  Although pioneering strain theorists who published a 1948 paper failed to interpret their data correctly, as a result of which their work was dismissed, in 1950 strain theorists Coffin and Manson published a widely recognized strain-analysis paper.  *See id.* at 214.  While much of the world does continue to use stress analysis, and Quesnel continues to teach it to his students, strain analysis had become state of the art by the mid-1960s and has been adopted by, among others, Ford Motor Company and even GMC.  *See id.* at 212-14; Quesnel Aff. ¶¶ 44-45.

2.      Quesnel's techniques have been subject to peer review and publication.  He has authored more than twenty refereed articles, published in technical journals, pertaining to his research and analysis of failure, fatigue, deformation and strength metals. *See* Quesnel Aff. ¶ 13.  Refereed articles are articles that have been reviewed by other engineers and scientists who determined that those articles contained work that was important and reliable and would make a valuable contribution to the archives of science.  *See id.*  He has published refereed articles about the manner and process of conducting calculations to determine metal failure, and has published refereed articles in the Journal of Engineering Fracture Mechanics.  *See id.* ¶ 14.

3.      Quesnel offers more than his *ipse dixit*.  Since 1996, in connection with other litigation, he has observed a large collection of failed 336032 flex fans.  *See id*. ¶ 18.  In reaching his conclusions, he (i) observed these fans to determine their mode of failure, *see id*., (ii) examined at least two new exemplar 336032 flex fans, *see id.* ¶ 18, comparing the sound of the blades with piano notes and determining that their resonant frequency (frequency of free vibration) is in the neighborhood of 30 to 50 Hz, *see id*. ¶ 30, (iii) further estimated the blades' resonant frequency by measuring the compliance of the blade in other cases and using both distributed-loading analysis and discrete or lumped parameter analysis, *see id*., (iv) compared this frequency with that of engines, which he calculated to be in the 40 to 50 Hz range at engine speeds between 2,400 and 3,000 rpm, typical of highway speeds, *see id*. ¶ 31, and (v) reviewed documentation disclosed in connection with other cases, from which he concluded that designers of the 336032 flex fan did not adequately consider the resonance mode that (in his view) causes the failure, *see id*. ¶ 29.

4.      While Quesnel did not test his hypothesis that the fan would enter rapid failure after 16,480 miles of operation at 2,782 rpm,  that is not a *sine qua non* pursuant to the flexible reliability test.  Quesnel suggests that such testing would have been impractical and is unnecessary in his field.  *See id*. ¶ 46.  In any event, as discussed above, he made calculations based on well-known engineering principles and examined a number of failed 336032 flex fans, discerning what, in his view, was a consistent failure pattern.  *See id*. ¶¶ 18-19, 31.  His testimony hence is based on a reliable foundation.  To the extent he could have strengthened that foundation by conducting testing, this goes to the weight, rather than admissibility, of his testimony.  *See, e.g., Ruiz-Troche,* 161 F.3d at 85 (opinion that "was premised on an accepted technique, embodied a methodology that has significant support in the relevant universe of scientific literature, and was expressed to a reasonable degree of pharmacological certainty" was not unreliable for *Daubert* purposes); *Nordisk Aluminum A/S v.*

*Stolle Corp.*, No. C-3-94-136, 1995 WL 1671911, at *3 (S.D. Ohio Sept. 11, 1995) ("Visser's opinions flow from his assertion that the Defendant failed adequately to design the Megaflex, because it failed to analyze properly the effects the higher press speed would have on the forces acting on the liftgate and transfer belt even though it knew that higher speeds would result in higher forces. Therefore, Visser has set forth the scientific principle upon which he has based his opinions. The fact that he does not state that he conducted a th[o]rough engineering analysis of the machine or that he performed other tests on it goes to the weight the factfinder will attribute to his opinions and not to their admissibility.").

5.      Quesnel did not ignore the bends and kinks in the plaintiff's fan but rather reasoned that, although their presence might speed or slow the failure process, the fundamental mode of failure was the same. *See* Quesnel Aff. ¶¶ 19, 41. He plausibly explains that he did not need to consider the condition of the vehicle, whether it had air conditioning or whether the water-pump bearings were worn because if one accepts the notion that use of 336032 flex fans in air-conditioned vehicles or with bad water-pump bearings leads to their failure, the use of such fans in itself is bad engineering. *See id*. ¶¶ 35-36. He did not need to remove the reinforcing cap on the plaintiff's fan; he was able to glean sufficient facts and data from the fracture mode, observation of the fracture surface of the portion of the separated blade that remains protruding from beneath the cap, and the similarity of the instant fracture to others he has seen in failed 336032 flex fans. *See id*. ¶ 40.

In any event, as the plaintiff points out, complaints about the factual underpinnings of an expert's conclusions generally go the weight, rather than admissibility, of testimony. *See* Exclude Opposition at 8-9; *see also, e.g., Brown v. Wal-Mart Stores, Inc*., 402 F. Supp.2d 303, 308 (D. Me. 2005) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the

14

opinion in cross-examination.  It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [that] such testimony [must] be excluded on foundational grounds.") (citations and internal quotation marks omitted).

6.    Quesnel's admission at deposition that the damage one can observe on the fan blade "could have" caused a blade to fail, *see* Quesnel Dep. at 196, is not fatal to admissibility of his testimony.  First, Quesnel plausibly explains that, in so testifying, he referred in part to the observable damage of the breakage from under the reinforcing cap, which was consistent with his overall design-defect theory.  *See* Quesnel Aff. ¶ 42.  Second, and in any event, Quesnel made clear, even as he testified that the damage on the blade "could have" caused a blade to fail, that he persisted in the belief that the primary cause of the blade failure likely was a design defect.  *See* Quesnel Dep. at 196. His purported concession accordingly does not undermine the reliability or relevance of his testimony.

In summary, after carefully reviewing Quesnel's deposition testimony, affidavit and report, I am satisfied that his opinion is the product of a reliable methodology and that there is sufficient fit between his conclusions and the instant flex-fan failure that his testimony likely would assist the triers of fact to understand or determine facts in issue.  The Motion To Exclude accordingly is denied with respect to Quesnel.

### 2.  Jorgensen

Jorgensen holds a bachelor of science degree in mechanical engineering from Cornell University and is licensed by the State of New York as a professional engineer.  *See* Affidavit of Robert Jorgensen, P.E. ("Jorgensen Aff."), Exh. C to Exclude Opposition, ¶ 2.  He was employed by the Buffalo Forge Company (now know as Howden Buffalo, Inc.), a leading fan company, from 1948 to 1990.  *See id.*  While employed, Jorgensen was author/editor of the sixth, seventh and eighth

editions of "Fan Engineering"; since his retirement, he has contracted with Howden Buffalo, Inc. to

revise, edit and produce the ninth edition of this well-known handbook. *See id.* He, too, is well-

familiar with the 336032 flex fan, having been retained as an expert witness in connection with eight

cases involving it. *See id.* The essence of Jorgensen's opinion is reflected in the following excerpt:

> [I]t is my engineering opinion within a reasonable degree of certainty that the 336032 flex fan produced by Canadian Fram Limited and sold by General Motors was inherently defective when it left the manufacturer and is unsafe because it will resonate at certain engine speeds and that those speeds can not be avoided. The data provided by defendants have been used to calculate cycles to failure. Those calculated values, even if increased by a factor of 10 or more[,] give lives that are far from the infinite life claimed. I have also shown by calculation the great similarity in results compared to those of the Cam[a]ro fan which was recalled. The 336032 flex fan was defectively designed and not suitable for use as a component for any engine or vehicle.

Letter dated July 12, 2006 from Robert Jorgensen, P.E. to The Ballow Law Firm ("Jorgensen

Report"), Exh. A to Jorgensen Aff., at 6.

    For many of the same reasons proffered with respect to Quesnel's testimony, the defendants

contend that Jorgensen's testimony (i) is not based on sufficient facts or data, (ii) lacks reliability and,

(iii) even if reliable, cannot reliably be applied to the facts of this case inasmuch as the facts have

been ignored. *See* Motion To Exclude at 14. Specifically, they assert that:

    1.    Jorgensen testified that he was unable to determine by observation of the plaintiff's fan

what type of fracture had occurred and whether it was consistent with other modes of failure he has

observed. *See id.* at 11. He stated he would like to disassemble the fan and have a metallurgist

examine the fracture surface to determine how the blade failed, and that until he is able to determine

whether this was a fatigue failure, he holds no opinion as to causation. *See id.* For this reason alone,

in the defendants' view, the Jorgensen testimony should be excluded. *See id.*

    2.    Like Quesnel, Jorgensen did little to investigate this particular case and rejected all

facts that might contradict his opinion. *See id.* For example, he never examined the plaintiff's truck,

believes it has a 350 C.I.D. engine (rather than a 327 C.I.D. engine) and is generally unaware of other facts the defendants deem relevant. *See id.*

3.  The testimony of Jorgensen and Quesnel clashes, with Quesnel attributing the fatigue failure to resonance caused by operation at normal engine operating speeds (55 miles per hour at 2,782 rpm) and Jorgensen attributing it to resonance caused by operation at idle (700 to 800 rpm). *See id.* at 12. This dissonance, in the defendants' view, "necessarily requires that [the testimony of] both be excluded." *Id.*

4.  Jorgensen's hand drawing of a parabola-like curve to calculate the natural frequency of the flex fan is "hardly scientific." *Id.* Moreover, Jorgensen admits that damage to a fan will change the natural frequency of the blades but has not calculated the frequency change in the plaintiff's fan assembly, as a result of which his opinions might bear on a pristine fan assembly but not on the damaged fan assembly of the plaintiff. *See id.* at 12-13.

5.  Jorgensen believes the cause of the blade failure is related to the engine's firing of torque pulses at idle; however, he has not calculated those torque pulses or their amplitude. *See id.* at 13. Moreover, his torque-pulse analysis assumes a 350 C.I.D. engine; he has never calibrated it to a 327 C.I.D. engine or, for that matter, any other engine that may have been installed in the plaintiff's vehicle. *See id.*

6.  Like Quesnel, Jorgensen has calculated a time to fan-blade failure pursuant to his theory (two calculations, one of 5,847 cycles at idle and one of 280,000 cycles at idle). *See id.* Although this theory is capable of being tested, Jorgensen has not tested it. *See id.*

7.  Jorgensen fails to offer any alternative design. *See id.* at 14.

The plaintiff proffers detailed documentation in support of Jorgensen's testimony, including an affidavit and report. *See generally* Jorgensen Aff.; Jorgensen Report. After careful review of these

materials, I am satisfied that the testimony of Jorgensen, like that of Quesnel, passes muster in terms of both reliability and fit. This is so inasmuch as:

1. As the plaintiff rejoins, Jorgensen did not testify that he could form no opinion as to causation. *See* Exclude Opposition at 12; Examination Before Trial of Robert Jorgensen ("Jorgensen Dep."), Exh. H to Motion To Exclude, at 51-52. Rather, he stated: "Oh, I saw enough to make me believe it [the plaintiff's fan] was similar to the other 336 fans which failed by fatigue, but if I'm going to get up on the stand and say I know that's fatigue for sure, I want to have better evidence by having that part examined properly." Jorgensen Dep. at 52. In his affidavit, Jorgensen clarifies:

> Within my deposition, I stated that, if I was going to conclude based upon absolute certainty, I would like to have the fan disassembled. This does not mean that I have not concluded that the fan was defectively designed based upon my work in this case and calculations performed. Within a reasonable degree of certainty in the field of mechanical engineering, this fan contains design defects as stated above and in my report. I do not have to have this fan disassembled to come to those conclusions. As I stated in my deposition, my opinions have remained the same as in other cases regarding Part No. 336032 and based upon my examination of the [plaintiff's] fan.

Jorgensen Aff. ¶ 8. As the plaintiff argues, absolute certainty is not a prerequisite to admissibility of an expert's testimony; rather, Jorgensen's proffer of a reasonable degree of certainty in the field of mechanical engineering suffices. *See* Exclude Opposition at 12; *see also, e.g., United States v. Monteiro*, 407 F. Supp.2d 351, 372 (D. Mass. 2006) ("The lack of absolute certainty on the part of the expert does not render her opinion unreliable under *Daubert*. The opinion of a qualified firearms examiner who has followed industry guidelines goes far beyond the type of unsupported speculation barred by *Daubert*.") (citations and internal quotation marks omitted).

2. Like Quesnel, Jorgensen did not ignore the defendants' claims that damage to the fan's surface, as well as its alleged use in a mismatched vehicle with a mismatched engine and with air conditioning, caused its failure. *See* Jorgensen Report at 1. Rather, he disagreed that those things played any significant role in the plaintiff's accident. *See id*. In any event, to the extent the defendants

18

believe the Jorgensen opinion rests on shaky factual underpinnings, cross-examination, rather than outright exclusion, is the appropriate remedy. *See, e.g., Brown*, 402 F. Supp.2d at 308.      3.      The defendants offer, and my research reveals, no authority for the proposition that a conflict in the opinions of a party's own experts justifies the exclusion of all.  I discern no meaningful difference between this situation and one in which opposing parties' experts clash – a circumstance in which it is clear that the disagreement goes to the weight, rather than admissibility, of the dueling opinions. *See, e.g., Bachir v. Transoceanic Cable Ship Co*., No. 98 Civ. 4625(JFK),  2002 WL 413918, at *8 (S.D.N.Y. Mar. 15, 2002) ("Trial courts should not abrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts[.]  A challenge will fail where it goes to the expert's weight and credibility, not the admissibility of his testimony.") (citations and internal quotation marks omitted).

4.      Jorgensen did not merely draw a parabola to establish the natural frequency of the flex fan.  He made painstaking mathematical calculations based on the defendants' own test data. *See* Jorgensen Report at 2-4.  To the extent the defendants assail Jorgensen's failure to account for certain variables that might have altered the equation (*e.g*., physical damage to the plaintiff's fan, measurement of torque pulses on the 350 versus 327 engine), this goes to the weight rather than admissibility of his opinion. *See, e.g., Brown*, 402 F. Supp.2d at 308.  While, as in the case of Quesnel, Jorgensen did not test his hypotheses of time to failure of the fan, he employed a reliable methodology based upon recognized engineering concepts and calculations. *See generally* Jorgensen Report (describing concepts considered and manner in which calculations made).  His failure to test, in these circumstances, goes to the weight rather than admissibility of his testimony. *See, e.g., Nordisk*, 1995 WL 1671911, at *3.

5.      Finally, Jorgensen does indeed address the issue of alternative design.  He asserts that there is no safe way to employ a flexible-blade fan in an automobile; hence, the alternative feasible design is usage of a fixed-pitch fan that does not flex.  *See* Jorgensen Report at 6.

After carefully reviewing Jorgensen's deposition testimony, affidavit and report, I am satisfied that his opinion is the product of a reliable methodology and that there is sufficient fit between his conclusions and the instant flex-fan failure that his testimony likely would assist the triers of fact to understand or determine facts in issue.  The Motion To Exclude accordingly is denied with respect to Jorgensen.

### 3.  Oddy

Oddy, founder and owner of Oddy's Automotive Racing and a former race-car driver who was inducted into the National Hot Rod Association Hall of Fame in 1992, has been a motor-vehicle engine builder since 1959, building and repairing more than 1,200 engines in a variety of motor vehicles.  *See* Affidavit of James Oddy ("Oddy Aff.") (Docket No. 50), Exh. E to Exclude Opposition, ¶¶ 1-2, 6.  Since 1976, Oddy has built high-performance engines for drag racing, stock-car racing, truck pulling and tractor pulling.  *See id.* ¶ 3.  His engines have been marketed throughout the United States, Canada, Australia, New Zealand and Puerto Rico.  *See id.*  Oddy opines, in a nutshell, that the plaintiff's fan failed not because of changes in engine componentry, as the defendants claim, but rather because of fatigue failure directly related to the way in which the fan was designed and marketed.  *See id.* ¶ 9.

The defendants contend that Oddy's deposition testimony reveals that he has done no work or analysis, and admittedly does not have the expertise or knowledge, to opine on any of the issues described in his expert disclosure.  *See* Motion To Exclude at 15.  This is so, they reason, inasmuch as Oddy does not know about significant modifications to the plaintiff's truck or about prior usage of the

truck or the flex fan and has admitted that he has no expertise in automotive cooling systems or fans. *See id.*

While Oddy lacks academic credentials, that alone is not fatal to the plaintiff's bid for his qualification as an expert. *See, e.g, United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005) ("While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience. Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.") (citations and internal punctuation omitted).

Nonetheless, the defendants are correct that certain of Oddy's expressed opinions range beyond the confines of his depth of knowledge acquired as a result of his hands-on training and experience as a builder and repairer of automotive engines. At deposition, Oddy admitted that his professional career as an engine builder and rebuilder "has had nothing to do with engine cooling systems as we traditionally understand them in passenger cars and trucks[.]" Examination Before Trial of James Joseph Oddy ("Oddy Dep."), Exh. I to Motion To Exclude, at 33-34. He further acknowledged that he does not specialize in the manufacture or design of fans. *See id.* at 94-95. He testified that, although from his observation the plaintiff's fan blade appeared to have failed from fatigue, he did not know why it had failed. *See id.* at 70.

Nothing in Oddy's report or affidavit offers any basis to believe that, notwithstanding the foregoing deposition testimony, he does in fact possess adequate training, experience, knowledge or other qualifications to speak to the issue of what caused or did not cause this fan's failure. *See generally* Oddy Aff.; Letter dated July 11, 2006 from James Oddy to John E. Ballow, Esq. ("Oddy

Report"), Exh. B to Oddy Aff.  Thus, the plaintiff falls short of demonstrating that Oddy is qualified to

opine that certain conditions (even engine conditions) caused or did not cause the fan to fail.  *See, e.g.,*

*TNT Road Co. v. Sterling Truck Corp.*, No. Civ. 03-37-B-K, 2004 WL 1626248, at *2 (D. Me. July

19, 2004) ("[I]t is incumbent on the proponent to ensure that the record contains evidence explaining

the methodology the expert employed to reach the challenged conclusion and why this methodology is

a reasonably reliable one to employ.").  Accordingly, such opinions are excluded.  These opinions are

reflected in (i) the final sentence of paragraph 9 of Oddy's affidavit, (ii) paragraphs 11, 12, 13, 17 and

18 in their entirety, (iii) the third sentence of paragraph 14, (iv) all of paragraph 16 save for the

observation that attachment of a snowplow would not place any additional load on the fan itself, and

(v) all of paragraph 19 save for the sentence, "The fan does not recognize the firing order as I testified

in my deposition at page 119 and 120."  Oddy Aff. ¶¶ 9-19.

By contrast, Oddy's many years of experience building and rebuilding engines and dealing

with the motoring public qualify him to render the opinions expressed in (i) paragraphs 10 and 15 of

his affidavit, (ii) the first, second and fourth sentences of paragraph 14, (iii) that portion of paragraph

16 stating that attachment of a snowplow does not place any additional load on the fan itself, and

(iv) that portion of paragraph 19 stating that the fan does not recognize the firing order of the engine.

*See id.* ¶¶ 10, 14-16, 19.  The majority of this remaining testimony also passes muster on the reliability

front inasmuch as it is based on decades of hands-on experience and recent or decades-long personal

observation by an experienced, knowledgeable witness (*e.g.*, observation recently of the plaintiff's fan

and vehicle, *see id.* ¶ 8(q)-(r); observation over the years of the presence of flex fans in vehicles

equipped with air conditioning, *see, e.g.*, Oddy Dep. at 36-37, 66-67).  *See, e.g., Bitler v. A.O. Smith*

*Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2005) (inasmuch as "the relevant reliability concerns may

focus upon personal knowledge or experience[,]" trial court did not abuse discretion in finding fire

investigator's "personal experience, training, method of observation, and deductive reasoning sufficiently reliable to constitute 'scientifically valid' methodology") (citation and internal quotation marks omitted).

Nonetheless, at this stage of analysis, one further opinion falls by the wayside. In his affidavit, Oddy states, "Upon inspection of the vehicle in question, the original equipment motor still seem[s] to exist within the engine compartment as I testified on page[s] 85 and 86." Oddy Aff. ¶ 15. While Oddy did state at that point in his deposition that the engine "appeared to be" the original-equipment motor, *see* Oddy Dep. at 85, earlier, in response to the question, "Do you know whether this engine was the original equipment engine for this truck, or came from some other location?" he had replied: "No way to tell." *Id*. at 26. In addition, as the defendants point out, *see* Motion To Exclude at 16, Oddy acknowledged that he had not looked for serial numbers or other identifying marks on the engine and did not know, and had not investigated, its date of manufacture, *see* Oddy Dep. at 24, 26. Thus, while weaknesses in the factual underpinnings of an expert's opinion generally are not a basis for exclusion, on this point, Oddy's testimony is sufficiently wanting in factual support to lack reliability. *See, e.g., Brown*, 402 F. Supp.2d at 308. His opinion expressed in paragraph 15 of his affidavit accordingly also is excluded.

To the extent Oddy's testimony survives the first two prongs of analysis, it survives the third. This remaining testimony likely would assist the trier of fact to understand or determine facts in issue, for example, whether flex fans are used with air-conditioned vehicles and whether it was reasonably foreseeable to the defendants that owners of vehicles would perform work on their own vehicles and use certain componentry interchangeably from one vehicle to another.

For all of the foregoing reasons, the Motion To Exclude is granted in part and denied in part insofar as it concerns Oddy.

### C. Defendants' Objections to Plaintiff's Statements of Material Facts

A final threshold issue requires resolution. In their summary-judgment reply memorandum, the defendants lodge a blanket objection to the plaintiff's statements of material facts (presumably both responsive and additional), asserting that:

1.      He "has filed several affidavits attaching a plethora of extraneous documents, transcripts or exhibits from other cases having nothing to do with the specific facts of *this* case." Reply Brief of All Defendants in Support of Motion for Summary Judgment ("Defendants' S/J Reply") (Docket No. 60) at 1 (emphasis in original).

2.      "Those materials are all unauthenticated, contain hearsay, lack foundation or concern matters about which the affiants obviously lack personal knowledge[.]" *Id.*

3.      Documents attached to affidavits should be entirely disregarded if neither sworn nor tendered in the form of certified copies. *See id.* at 1-2.

Local Rule 56 does not contemplate the lodging of a blanket request to strike responsive or additional facts. To the contrary, it provides: "If a party contends that an individual statement of fact should not be considered by the court, the party may include as part of the response that the statement of fact 'should be stricken' with a brief statement of the reason(s) and the authority or record citation in support. Without prejudice to the determination of the request to strike the party shall admit, deny or qualify the statement as provided in this rule." Loc. R. 56(e).

As it happens, in keeping with the above-quoted rule, the defendants have included, in their reply statement of material facts, numerous requests to strike specific statements of additional facts on some of the same grounds outlined above. *See generally* Defendants' Response to Plaintiff's Additional Statement of Alleged Material Facts ("Defendants' Reply SMF") (Docket No. 61). These objections are properly presented, and I will consider them. However, to the extent the defendants

have failed to make such individualized requests in response to the plaintiff's proffered facts (responsive or additional), I decline to wade through the parties' papers to attempt to determine which, if any, of the defendants' blanket objections might apply. The blanket objections accordingly are disregarded.

### D. Facts Cognizable on Summary Judgment

With the foregoing ancillary issues resolved, the parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following relevant to this recommended decision: [3]

This litigation involves a flexible cooling fan (a "flex fan" or "336032 flex fan") that the plaintiff alleges was defective. Defendants' SMF ¶ 1; Plaintiff's Opposing SMF ¶ 1. The plaintiff sued Honeywell International and Honeywell Canada, alleging that they are both "successors" to Canadian Fram, Ltd. ("Canadian Fram"), the entity that manufactured the fan. *Id*. The plaintiff also sued GMC, which originally assembled and sold his 1979 GMC Jimmy. *Id*.

In approximately 1996, the plaintiff purchased a 1979 GMC Jimmy. Plaintiff's Additional Statement of Material Facts ("Plaintiff's Additional SMF"), commencing on page 8 of Plaintiff's Opposing SMF, ¶ 74; Defendants' Reply SMF ¶ 74.[4] On January 18, 2000 the plaintiff was checking the fluid levels on his truck. *Id*. ¶ 97. He had walked to the driver's side of his truck and was looking into the engine compartment to confirm that he had checked all of the fluids when one blade of the flex fan, without notice, broke from the fan and propelled outward at a high rate of speed, striking him in

---

[3] As noted above, Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement. *See* Loc. R. 56(c)-(d). The concept of "qualification" presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information. Except to the extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, I have deemed it admitted.

[4] The plaintiff offers more than a hundred statements of additional fact. *See generally* Plaintiff's Additional SMF. I have set forth only such of those statements as I have deemed (i) helpful or necessary to resolution of the instant motion, (ii) supported by the record citations supplied, if not otherwise admitted by the defendants, and (iii) admissible over objection (if any) by the defendants. In so doing, I do not mean to imply that the omitted evidence (whose absence is not outcome-determinative for purposes of resolution of the

(*continued on next page*)

the face, head and eye. *Id*. ¶ 100.[5]  The plaintiff sustained serious injuries, including a mandible

fracture, multiple facial lacerations, eye lacerations and the loss of his left eye. *Id*. ¶ 101.

Because of the nature of his injuries, the plaintiff did not stop the engine of the truck but

proceeded immediately into his house to seek medical attention. *Id*. ¶ 102.  The following day Barry

Bisco went to the plaintiff's home to see how he could help. *Id*. ¶ 103.  When he arrived there, he saw

the truck with the hood up. *Id*.  The key was still in the ignition in the "on" position. *Id*.  Bisco

concluded that the truck had either stalled or run out of gas. *Id*.  Bisco never observed any damage to

the truck indicating that it had been involved in an accident.  Plaintiff's Additional SMF ¶ 104;

Deposition of Barry L. Bisco ("Bisco Dep.") (Docket No. 65) at 11.[6]  When Bisco saw the fan on the

truck, he noticed that one of the fan blades was missing.  Plaintiff's Additional SMF ¶ 105;

Defendants' Reply SMF ¶ 105.  He looked for the missing blade without success. *Id*. ¶ 106.  The

plaintiff, his wife Debra Small and many family members later attempted on numerous occasions to

locate the missing blade without success. *Id*. ¶ 107.

Bisco removed the broken fan from the truck and put it in the plaintiff's workshop on a shelf

under his workbench. *Id*. ¶ 108. While the fan was stored under the workbench, white glue dripped

onto it. *Id*. ¶ 117.  The glue is still on the fan. *Id*.  Bisco, who is the plaintiff's nephew, testified that

he left the water pump, as well as the fan, on the plaintiff's work bench.  Defendants' SMF ¶¶ 37-38;

Plaintiff's Opposing SMF ¶¶ 37-38.  The water pump has never been presented to the defendants for

inspection, and its location is unknown. *Id*.  The plaintiff has never seen the water pump that Bisco

---

instant motion) should be deemed inadmissible or irrelevant at trial.

[5] In this and several other instances, the defendants purport to qualify statements by admitting that a deponent so testified but observing that "this testimony, by itself, does not conclusively establish the asserted proposition, nor does it exclude the possibility of a contrary conclusion." Defendants' Reply SMF ¶ 100; *see also id*. ¶¶ 83, 87-88, 90-91, 93, 95-96,  102, 105-08, 117, 131.  Inasmuch as this is not a factual qualification of the sort contemplated by Local Rule 56 but rather a legal argument, it is disregarded.

[6] The defendants' objection to this statement on the ground that it lacks proper foundation, constitutes speculation and is based on inadmissible hearsay, *see* Defendants' Reply SMF ¶ 104, is overruled.  Bisco does not testify that the truck never was in an accident; rather, he testifies that he observed no damage indicating that it had been.

removed from his truck.  Plaintiff's Additional SMF ¶ 116; Defendants' Reply SMF ¶ 116.  He does

not know where it is or who disposed of it.  *Id*.  His efforts to find out what happened to it have been

unsuccessful.  *Id*.

When in use, a flex fan mounts to a water pump's shaft.  Defendants' SMF ¶ 39; Plaintiff's

Opposing SMF ¶ 39.  If the water-pump bearings fail, the shaft will turn eccentrically, causing the fan

to operate out of balance.  *Id*.  On the other hand, if a fan is mechanically damaged so that it is

operating in an unbalanced condition, this can burn out the bearings in the water pump.  *Id*.  Bisco

testified that because the water-pump bearings were "worn out," they caused "unbalance" and

"wobble" in the water-pump shaft.  *Id*. ¶ 40.  Such a condition will cause the fan to operate out of

balance.  *Id*.  Bisco also testified that when he removed the fan he did not use a torque wrench or take

any torque readings on the bolts that attached the fan to the spacer and water-pump shaft.  *Id*. ¶ 41.

Those bolts are supposed to be torqued to specified values.  *Id*. ¶ 42.  If they are not torqued to the

correct value, they can back out in use over time, leading to another situation in which the fan will

operate out of balance.  *Id*.[7]  The fan that Bisco removed was mounted properly on the truck.

Plaintiff's Additional SMF ¶ 110; Bisco Dep. at 28.[8]  Bisco replaced the water pump because the

bearings and seal were worn out from the fan operating out of balance after the blade had broken off.

Plaintiff's Additional SMF ¶ 111; Bisco Dep. at 18.[9]

The fan involved in this case is GMC Part No. 336032.  Defendants' SMF ¶ 4; Plaintiff's

Opposing SMF ¶ 4.  GMC used 336032 flex fans between 1973 and 1979 on Chevrolet and GMC

---

[7] The plaintiff qualifies paragraphs 39, 40 and 42, asserting that there is no evidence that the fan operated out of balance or that the water pump was damaged prior to the day of his injury.  *See* Plaintiff's Opposing SMF ¶¶ 39-40, 42; Video Deposition of Donald J. Small [Sr.] ("Small Dep."), Exh. 3 to Quesnel Aff., at 36, 42-44.

[8] The defendants deny this, *see* Defendants' Reply SMF ¶ 110; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[9] The defendants deny that the water pump failed after running for only a few hours following the accident, *see* Defendants' Reply SMF ¶ 111; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

light-duty trucks. *Id.*[10] Part No. 336032 was the original-equipment fan installed on the GMC Jimmy model sold by GMC during model year 1979. Plaintiff's Additional SMF ¶ 77; Complaint ¶ 15; GMC Answer ¶ 15.[11] On this fan the unique part number, 336032, is stamped into the metal reinforcing caps. Defendants' SMF ¶ 6; Plaintiff's Opposing SMF ¶ 6.[12]

Each fan part number that Canadian Fram manufactured for GMC was specified by GMC for use in a particular vehicle and engine configuration. *Id.* ¶ 2. The type of fan selected by GMC depended upon the engine environment, resonance, expected output, cooling requirements and other factors that varied significantly from one vehicle and one engine environment to another. *Id.* ¶ 3. GMC's truck engine environments also varied significantly from model to model. *Id.*

The correct application for any component is determined by consulting detailed parts books published by vehicle manufacturers and distributed widely to dealerships, garages and retailers of aftermarket parts and then by matching the correct part number to the correct vehicle, engine and operating environment. *Id.* ¶ 7. The procedure of consulting parts books to identify the correct components for any vehicle application is so widespread and long-standing that it is now a matter of common knowledge. *Id.* ¶ 8.

GMC's service manuals contained warnings that damaged fans should not be reused but should be replaced with new fan assemblies:

> **CAUTION:** *IF A FAN BLADE IS BENT OR DAMAGED IN ANY WAY, NO ATTEMPT SHOULD BE MADE TO REPAIR AND/OR REUSE THE DAMAGED*

---

[10] I omit the defendants' further statement that GMC used 336032 flex fans on trucks equipped with V8 engines and heavy-duty cooling systems but not air conditioning, *see* Defendants' SMF ¶ 4, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶ 4; Complaint ¶ 15; Answer, Affirmative Defenses and Jury Demand of Defendant General Motors Corporation ("GMC Answer") (Docket No. 4) ¶ 15; Oddy Aff. ¶ 14.

[11] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 77; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[12] I omit the balance of paragraph 6, as well as the entirety of paragraph 9, *see* Defendants' SMF ¶¶ 6, 9, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶ 6; Oddy Dep. at 90-91; Plaintiff's Opposing SMF ¶ 9; Jorgensen Aff. ¶ 7(m).

> *PART.  A BENT OR DAMAGED FAN ASSEMBLY SHOULD ALWAYS BE REPLACED WITH A NEW FAN ASSEMBLY.*
>
> **IT IS ESSENTIAL THAT THE FAN ASSEMBLY REMAIN IN PROPER BALANCE.  BALANCE CANNOT BE ASSURED ONCE A FAN ASSEMBLY HAS BEEN BENT OR DAMAGED.  A FAN ASSEMBLY THAT IS NOT IN PROPER BALANCE COULD FAIL AND FLY APART DURING SUBSEQUENT USE, CREATING AN EXTREMELY DANGEROUS CONDITION.**

*Id*. ¶ 10.  Other Service Instructions published by GMC stated:

> **<u>CAUTION</u>: FOR YOUR PROTECTION, THE HOOD SHOULD BE CLOSED WHEN REVVING ENGINE.**
>
> **NEVER STAND IN LINE WITH OR NEAR FAN WHEN REVVING ENGINE. FOR YOUR OWN PROTECTION, THE HOOD SHOULD BE CLOSED WHEN REVVING ENGINE.**

*Id*. ¶ 11.[13]  The Owner's Manual has no direction that the owner inspect the fan, and it is "not in the interest of General Motors to place information like that in the owner's manual."  Plaintiff's Additional SMF ¶ 125; Zych Dep. at 93.[14]

The Honeywell defendants' expert, Robert Loucks, inspected the fan.  Defendants' SMF ¶ 13; Plaintiff's Opposing SMF ¶ 13.[15]  In addition to being stamped as GMC Part No. "336032," the fan bore a date code of "B 75," indicating that it had been manufactured by Canadian Fram in February 1975.  *Id*.  In the normal course of business, the fan would have been shipped to GMC within four to six weeks after it was manufactured for use as an original-equipment fan in those GMC vehicles with which it was compatible.  *Id*. ¶ 14.  GMC's new-vehicle invoice for the 1979 GMC Jimmy indicates

---

[13] The plaintiff qualifies both this paragraph and paragraph 10, admitting that the warnings appeared in service manuals but denying that any such warnings were present in the owner's manual for the 1979 GMC Jimmy.  *See* Plaintiff's Opposing SMF ¶¶ 10-11; Deposition of Walter L. Zych, *Taft v. General Motors Corp*., No. 95-CV-4235 (W.D.N.Y. Mar. 6, 1996) ("Zych Dep.") (Docket No. 55), at 93, 116.

[14] The defendants' objection to this statement on grounds that the cited reference is taken out of context and is irrelevant, *see* Defendants' Reply SMF ¶ 125, is overruled.

[15] The defendants do not make clear whether they refer to Honeywell International, Honeywell Canada, or both.  *See* Defendants' SMF ¶ 13.  Inasmuch as nothing turns on the distinction, I have assumed they refer to both Honeywell defendants.

that, when it was new, this truck was equipped with factory-installed air conditioning. *Id*. ¶ 15.[16] The engine installed in the vehicle is a 1960s, 327-cubic-inch engine. Defendants' SMF ¶ 32; Affidavit of Victor J. Hakim in Support of Motion for Summary Judgment ("Hakim Aff."), Exh. F to Motion To Exclude, ¶ 4.[17] Mismatching a flex fan to an incorrect engine can contribute to premature failure of the fan. Defendants' SMF ¶ 33; Hakim Aff. ¶ 14.[18] The engine in the truck at the time of the plaintiff's accident is not only an incorrect engine but also is older than the truck. Defendants' SMF ¶ 35; Hakim Aff. ¶ 4.[19]

The fan involved in this case is the second most heavily abused fan Loucks has ever inspected, exceeded only by a fan that was intentionally cut down to fit inside an incorrect shroud. Defendants' SMF ¶ 19; Plaintiff's Opposing SMF ¶ 19.[20] One blade is missing from the fan. *Id*. ¶ 20. Its whereabouts are unknown. *Id*.[21] Blade Nos. 1 through 7 and Reinforcing Cap Nos. 1 through 7 on the fan are damaged. *Id*. ¶¶ 22-28.[22] GMC's expert, Victor Hakim, agrees that damage to this fan was extraordinarily heavy. *Id*. ¶ 31.[23]

---

[16] I omit paragraphs 16 through 18 (stating that 336032 flex fans never were released for use with air-conditioned vehicles, the fan was mismatched to the plaintiff's 1979 GMC Jimmy, and no one knows who installed it or when), *see* Defendants' SMF ¶¶ 16-18, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶¶ 16-18; Oddy Aff. ¶ 14; Oddy Dep. at 86-87; Complaint ¶ 15; GMC Answer ¶ 15.

[17] The plaintiff purports to deny this paragraph, *see* Plaintiff's Opposing SMF ¶ 32; however, the portions of the record he cites are stricken in response to the Motion To Exclude or do not support his denial. I have set forth so much of the defendants' underlying statement as is supported by the citation they provide.

[18] The plaintiff purports to deny this paragraph, *see* Plaintiff's Opposing SMF ¶ 33; however, the portion of the record he cites was stricken in response to the Motion To Exclude. I have set forth so much of the defendants' underlying statement as is supported by the citation they provide.

[19] The plaintiff purports to deny this paragraph, *see* Plaintiff's Opposing SMF ¶ 35; however, the portions of the record he cites were stricken in response to the Motion To Exclude or do not support his denial. I have set forth so much of the defendants' underlying statement as is supported by the citations they provide.

[20] The plaintiff qualifies this statement, denying that the damage is as significant as Loucks claims. *See* Plaintiff's Opposing SMF ¶ 19; Jorgensen Aff. ¶ 3; Quesnel Aff. ¶ 32.

[21] I omit the balance of paragraph 20 (asserting that one spider arm is so heavily damaged the attached blade cannot flex at all), *see* Defendants' SMF ¶ 20, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶ 20; Quesnel Aff. ¶ 41. I also omit paragraph 21 (asserting that heavy mechanical damage such as that seen on the fan in question leads to its premature failure), *see* Defendants' SMF ¶ 21, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶ 21; Jorgensen Aff. ¶ 3; Quesnel Aff. ¶ 41.

[22] I omit the following paragraphs, which the plaintiff denies: (i) paragraph 29, asserting that the reinforcing caps on the fan are lifted away from the blades, indicating it was operated in an "out of balance" condition, causing excessive vibration and oscillation of the (*continued on next page*)

The Honeywell defendants also had the truck examined by a mechanic, James Purdon.  *Id*. ¶ 44.[24]  The engine radiator has been replaced, and the radiator now on the truck was not designed for this model vehicle.  *Id*. ¶ 45.[25]  The radiator fan shroud has been replaced.  Defendants' SMF ¶ 46; Affidavit of James W. Purdon, III ("Purdon Aff."), attached to Defendants' SMF, ¶ 5(b).  It is not the original shroud that came with the truck when it was new.  *Id*.  The shroud on the truck has about a two-and-a-half inch gap from the top of the shroud to the top radiator support, and it is held in place by homemade brackets.  *Id*.[26]  The air-conditioning system has been removed from the truck.  Defendants' SMF ¶ 47; Plaintiff's Opposing SMF ¶ 47.  The air-conditioning compressor is missing, the hoses going to the evaporator case have been cut off, and the air-conditioning condenser has been removed.  *Id*.  The front radiator grille of the truck has been replaced with an aftermarket custom tube grille.  *Id*. ¶ 48.  The truck previously had been outfitted with an aftermarket snow plow.  *Id*. ¶ 49.  The engine water pump on the truck has been replaced with an after-market pump.  *Id*. ¶ 51.  The factory battery box and hold-downs on the truck have been replaced with a homemade battery box.  *Id*. ¶ 52.  The engine-valve covers on the truck have been replaced with after-market covers manufactured by Edlebrock Performance.  *Id.* ¶ 53.

---

blades, *see* Defendants' SMF ¶ 29; Plaintiff's Opposing SMF ¶ 29; Quesnel Report at 4; (ii) paragraph 30, asserting that one of the mounting-bolt holes on the fan was filled with a white foreign substance and washer marks around that hole appeared lighter than those around the remaining three holes, indicating the fan at one time may have been mounted by three bolts rather than four, *see* Defendants' SMF ¶ 30; Plaintiff's Opposing SMF ¶ 30; Bisco Dep. at 16; (iii) paragraph 34, asserting that the fan is three years older than the vehicle and was not original equipment in that air-conditioned truck, *see* Defendants' SMF ¶ 34; Plaintiff's Opposing SMF ¶ 34; Complaint ¶ 15; GMC Answer ¶ 15; and (iv) paragraph 36, asserting that while the fan operated in the plaintiff's truck, it functioned in a substantially modified and incorrect environment that led directly to its ultimate failure, *see* Defendants' SMF ¶ 36; Plaintiff's Opposing SMF ¶ 36; Quesnel Aff. ¶ 35; Complaint ¶ 15; GMC Answer ¶ 15.

[23] The plaintiff qualifies this statement, denying that damage to the fan is as significant as Hakim claims.  *See* Plaintiff's Opposing SMF ¶ 31; Jorgensen Aff. ¶ 3; Quesnel Aff. ¶ 32.

[24] I omit the balance of paragraph 44 (describing Purdon as having found several non-standard conditions), *see* Defendants' SMF ¶ 44, which the plaintiff denies, *see* Plaintiff's Opposing SMF ¶ 44; Oddy Aff. ¶ 10.

[25] The plaintiff purports to deny that the radiator now on the truck was not designed for it, *see* Plaintiff's Opposing SMF ¶ 45; however, the record citation he supplies does not support his denial.

[26] The plaintiff purports to deny this statement, *see* Plaintiff's Opposing SMF ¶ 46; however, the record citation he supplies does not support his denial.

The body of the truck has been converted from that of a five-passenger sport utility vehicle to a pickup, and the factory fiberglass truck top is missing. *Id*. ¶ 54. A homemade wood panel was installed as the rear cab panel of the truck, and the rear factory seat has been removed. *Id*. ¶ 55. The factory steel tailgate with roll-up window on the truck has been removed, and a homemade wood tailgate has been installed. *Id*. ¶ 56. The front seats of the truck have been changed to non-factory custom seats, and a non-factor class I-II trailer hitch has been installed. *Id*. ¶ 57. Oversized tires are on the truck. *Id*. ¶ 58. The last state safety inspection of the truck expired in September 1998. *Id*. ¶ 59.

The radiator fan shroud partially encloses the fan and directs air flow around it. Defendants' SMF ¶ 62; Affidavit of Robert R. Loucks in Support of Motion for Summary Judgment ("Loucks Aff."), attached to Motion To Exclude, ¶ 13.1. If the fan shroud is too small, it can interfere with the fan blades as they rotate, increasing operational stresses on the fan blades or possibly damaging them. *Id*. All of the blade tips on the subject fan were heavily "polished" (paint was removed from the tips), and many of the blade tips exhibited dents and gouges. *Id*.[27] Most of the blade tips on this fan are bent, suggesting that the tips were mechanically damaged by contact with unknown objects at some time in the fan's operational history. Defendants' SMF ¶ 63; Plaintiff's Opposing SMF ¶ 63.[28]

---

[27] The plaintiff purports to deny paragraph 62, *see* Plaintiff's Opposing SMF ¶ 62; however, the record citations he supplies do not support his denial.

[28] I omit the following paragraphs, which the plaintiff denies: (i) paragraph 50, asserting that the configuration of the engine belts on the truck was changed, *see* Defendants' SMF ¶ 50; Plaintiff's Opposing SMF ¶ 50; Affidavit of Donald J. Small, Sr. ("Small Aff."), Exh. A to Plaintiff's Opposing SMF, ¶ 15; (ii) paragraph 60, asserting that a certain engine code is stamped on the engine in the truck, *see* Defendants' SMF ¶ 60; Plaintiff's Opposing SMF ¶ 60; Small Aff. ¶ 14; (iii) paragraph 61, asserting that certain of the truck's non-standard conditions could cause damage contributing to the ultimate separation of the blade from the fan, *see* Defendants' SMF ¶ 61; Plaintiff's Opposing SMF ¶ 61; Quesnel Aff. ¶ 35; (iv) paragraph 64, asserting that 336032 flex fans were never designed, tested or certified for use in air-conditioned vehicles and that air conditioning places unforeseeable stresses on such fans, *see* Defendants' SMF ¶ 64; Plaintiff's Opposing SMF ¶ 64; Oddy Aff. ¶ 14; Quesnel Aff. ¶ 35; (v) paragraph 65, asserting that the extent of damage to one of the arms on the flex fan (which was more heavily bent than the others) was consistent either with damage sustained in a frontal accident or damage caused by a significant impact to the fan when it was out of the vehicle and that, in either event, the damage to the arm prevented the fan blade attached to it from flexing, adversely affecting the balance and resonance of the fan, *see* Defendants' SMF ¶ 65; Plaintiff's Opposing SMF ¶ 65; Quesnel Report at 5-6; and (vi) paragraph 67, asserting that coupling a flex fan to an incorrect engine will subject the fan to unforeseeable stresses and resonance, *see* Defendants' SMF ¶ 67; Plaintiff's Opposing SMF ¶ 67; Oddy (*continued on next page*)

Flex fans were tested and certified for use only with specific engine and accessory configurations.  Defendants' SMF ¶ 66; Loucks Aff. ¶ 13.4.  The vehicle's belts are driven by a sheave fitted to the water-pump shaft.  *Id*.  Belts that are too loose, too tight or not of the original equipment configuration or quantity can place unforeseeable operational stresses on a flex fan.  *Id*.[29]

The truck did not have any mechanical problems when the plaintiff purchased it, nor was there any indication it had been involved in an accident.  Plaintiff's Additional SMF ¶¶ 80-81; Defendants' Reply SMF ¶¶ 80-81.[30]  There was no damage to it (other than rust) at the time of purchase.  *Id*. ¶ 82. The plaintiff did not have any accidents during the period that he owned the truck.  *Id*. ¶ 83.  During the four years that the plaintiff owned the truck, he did not have any mechanical problems with the engine, did not hear any unusual noises or vibrations in the engine and did not have any problems with the water pump, alternator or cooling fan.  *Id*. ¶¶ 84-86.  The only repair to the truck engine during the entire period the plaintiff owned the truck was a tuneup performed by a licensed mechanic.  *Id*. ¶ 87. The plaintiff did not change the engine, fan or water pump in the truck from the time he purchased it until after his injury.  *Id*. ¶ 88.  The truck did not have an air-conditioning compressor during the time the plaintiff owned it.  *Id*. ¶ 89.  There was no plow mechanism on the truck when the plaintiff

---

Aff. ¶ 10.

[29] The plaintiff purports to deny this statement, *see* Plaintiff's Opposing SMF ¶ 66; however; the record citations he supplies do not support his denial.  The plaintiff's requests to strike conclusions of defense experts Loucks and Hakim, *see* Defendants' SMF ¶¶ 68-69; Plaintiff's Opposing SMF ¶¶ 68-69, are granted to the extent the defendants rehash points made elsewhere in their statement of material facts, *see* Defendants' SMF ¶¶ 68(C)-(I), (L) & 69.  Loucks' and Hakim's remaining conclusions – that (i) the fan was properly designed and tested and not defective, (ii) the fan was reasonably fit, suitable and safe for its intended use, (iii) the blade separation was most probably caused by mechanical damage, possible mishandling of the fan while it was outside of a vehicle and/or its operation in an incorrect engine/vehicle environment, and (iv) the fan appeared to have been repainted at some point to conceal damage, *see id*. ¶¶ 68(A)-(B), (J)-(K) & 69, are disregarded inasmuch as contested by the plaintiff, *see* Plaintiff's Opposing SMF ¶¶ 68-69; Jorgensen Aff. ¶ 7; Quesnel Report at 4-6.

[30] The defendants qualify these paragraphs and several others with the assertion that the plaintiff admitted he does not have any type of training in automobile mechanics.  *See* Defendants' Reply SMF ¶¶ 80-82, 84-86, 92; Small Dep. at 12.  They add that the plaintiff therefore is incompetent to draw the conclusions set forth in those statements.  *See id*.  To the extent the latter assertion represents a request to strike or an objection, it is overruled.  The plaintiff testified that although he had no "training" in automobile mechanics, he had picked up motor-vehicle repair skills on his own and had been working on cars nearly all of his life.  *See* Small Dep. at 12. Moreover, the testimony in question is based on the plaintiff's personal observation (for example, whether he saw damage, had mechanical problems or heard noises).

purchased it. *Id.* ¶ 90. The plaintiff installed a plow on the truck to plow his driveway and those of a few neighbors. *Id.* ¶ 91. He used the truck only for snow plowing and, once in a great while, to go to work. *Id.* The plow was electric and required no reconfiguration of any engine belts. *Id.* ¶ 92.

The plaintiff did not inspect the fan while he owned the truck because he had no reason to. *Id.* ¶ 93. Even if he had observed any bends or nicks in one or more of the fan blades, he would not have known that he should replace the fan inasmuch as his truck's engine ran well. Plaintiff's Additional SMF ¶ 94; Small Aff. ¶ 4.[31] He did not have any type of training in automobile mechanics. Plaintiff's Additional SMF ¶ 95; Defendants' Reply SMF ¶ 95. On the day he was injured, the plaintiff did not have any difficulty starting the truck, did not hear any unusual sounds from the engine, did not hear any unusual vibrations and did not hear any unusual noises from the fan blade. *Id.* ¶ 96.

Air conditioning will not change the fundamental problem with resonance. Plaintiff's Additional SMF ¶ 129; Quesnel Dep. at 240.[32] The size of the tires on the plaintiff's truck would not have had an impact on whether or not the flex fan failed. Plaintiff's Additional SMF ¶ 131; Defendants' Reply SMF ¶ 131. Modifying the engine environment will not change the resonant frequency of the fan blade. Plaintiff's Additional SMF ¶ 134; Quesnel Dep. at 242.[33] The bends and kinks in the fan were not the cause of, nor did they contribute to, the fan's failure. Plaintiff's Additional SMF ¶ 135; Jorgensen Aff. ¶ 3.[34] There is no evidence that the bends and kinks on the fan

---

[31] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 94; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[32] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 129; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[33] The defendants' objection to this statement on grounds that it is irrelevant, ambiguous and intentionally misleading, *see* Defendants' Reply SMF ¶ 134, is overruled. The defendants purport, alternatively, to qualify the statement; however, their assertion that operating a fan in an incorrect environment may cause stresses that may lead to fan failure, *see id.*, is at odds with the plaintiff's cognizable evidence and is on that basis disregarded.

[34] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 135; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

were present prior to the time of failure as opposed to having occurred by the failure itself or by removal of the blade following the failure.  Plaintiff's Additional SMF ¶ 136; Jorgensen Aff. ¶ 3.[35]

It is reasonably foreseeable that flex fans, including the 336032 flex fan, will be used in a vehicle environment that includes modifications to the vehicle such as the presence of air conditioning. Plaintiff's Additional SMF ¶ 138; Quesnel Aff. ¶¶ 35-36.  It is also reasonably foreseeable that water-pump bearings will go bad and that fans will be damaged during normal usage by road and engine conditions.  Id.; Quesnel Dep. at 165-67.[36]  The defendants knew that owners of vehicles performed work on their own vehicles and either personally, or through third parties, performed engine modifications on their vehicles.  Plaintiff's Additional SMF ¶¶ 139-40; Oddy Aff. ¶ 10.[37]  The defendants knew that radiator fans were interchangeable among a variety of vehicle models and engine types.  Plaintiff's Additional SMF ¶ 141; Oddy Aff. ¶ 10; Jorgensen Dep. at 71.[38]  General Motors Division Light Trucks – 78TL, Revised 4-79, a GMC-generated document, states: "Original equipment

---

[35] The defendants deny this statement, see Defendants' Reply SMF ¶ 136; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[36] The defendants' objection to paragraph 138 on grounds that it represents a legal conclusion, is overly broad and is based on nothing more than the ipse dixit of a hired expert, see Defendants' Reply SMF ¶ 138, is overruled.  The defendants alternatively deny the statement, see id.; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[37] The defendants' objections to these statements on grounds that they are overly broad, constitute speculation about the knowledge of others and are inadmissible hearsay, see Defendants' Reply SMF ¶¶ 139-40, are overruled.  Federal Rule of Evidence 703 "specifically permits expert witnesses to rely on otherwise inadmissible hearsay of a type reasonably relied on by experts in the field." United States v. Corey, 207 F.3d 84, 91 (1st Cir. 2000) (citation and internal quotation marks omitted).  To the extent it is not simply common knowledge that vehicle owners work on and make modifications to their vehicles, Oddy was well-positioned to know whether vehicle owners performed such work and could reasonably infer such knowledge on the part of these automotive-industry defendants.  The defendants alternatively deny these statements, see Defendants' Reply SMF ¶¶ 139-40; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[38] The defendants' objection to this statement on grounds that is overly broad, constitutes speculation about the knowledge of others and is inadmissible hearsay, see Defendants' Reply SMF ¶ 141, is overruled.  An expert may rely on otherwise inadmissible hearsay of a type reasonably relied on by experts in the field. See, e.g., Corey, 207 F.3d at 91.

Nor is the statement unduly speculative.  Oddy, an expert engine rebuilder and repairer, and Jorgensen, an expert on fan design, were well-positioned to know whether fans were interchangeable, and reasonably could infer such knowledge on the part of manufacturers, designers and sellers of fans such as these automotive-industry defendants.  The defendants alternatively deny the statement, see Defendants' Reply SMF ¶ 141; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

fans may be replaced by fans with additional blades, higher strength materials, or composite bolt circles." Plaintiff's Additional SMF ¶ 142; Zych Dep. at 127-28.[39]

The fan failed as a result of an inherent defect in its design allowing it to bend and be subject to resonance over the life of the fan. Plaintiff's Additional SMF ¶ 143; Quesnel Aff. ¶ 29; Jorgensen Dep. at 170-71.[40] All 336032 flex-fan blades eventually will fail because of fatigue failure. Plaintiff's Additional SMF ¶ 144; Jorgensen Aff. ¶ 7(a)-(b).[41] The plaintiff's fan demonstrated the same mode of fatigue failure as prior 336032 flex fans that had failed: namely, fatigue of the blade section (the part that is missing), causing the blade to separate and to be propelled outward at a high rate of speed. Plaintiff's Additional SMF ¶ 145; Jorgensen Aff. ¶ 7; Quesnel Aff. ¶ 53; Quesnel Dep. at 66, 69.[42]

With regard to the blade that failed as a result of fatigue, there is still a piece of blade captured between the reinforcing cap and the spider cap, showing a region of shear lip that represents fast fracture, so the fracture progressed from under the fan reinforcing cap toward the outer edge. Plaintiff's Additional SMF ¶ 155; Quesnel Dep. at 185.[43] The 336032 flex-fan blades that have failed have had varying degrees of damage. Plaintiff's Additional SMF ¶ 157; Quesnel Dep. at 168-69. In the *Mangan*, *Wagner*, *Mikitarian* and *Leoni* cases, there was no significant incidental damage, and the

---

[39] The defendants' objection to this statement on the grounds that, as to the Honeywell defendants, it represents inadmissible hearsay, and as to GMC, it is an incomplete and misleading partial quotation, *see* Defendants' Reply SMF ¶ 142, is overruled. The statement is not offered for the truth of the matter quoted, but rather to illustrate what GMC knew when. While the defendants complain that the quotation is incomplete, they offer no supplement to it. The defendants alternatively deny the statement, *see id.*; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[40] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 143; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[41] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 144; however, I view the cognizable evidence in the light most favorable to the plaintiff as nonmovant.

[42] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 145; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[43] The defendants' objection to this statement on the ground that it represents an overly broad narrative summary of an unqualified expert, *see* Defendants' Reply SMF ¶ 155, is overruled. The defendants alternatively qualify the statement, asserting that the fatigue was caused by mechanical damage and out-of-balance operation in an incorrect environment, *see id.*; however, this theory is at odds with that of the plaintiff, whose view I credit for purposes of resolving the instant motion.

fans failed despite being in reasonably good shape. *Id*.; Quesnel Dep. at 171.[44] No one knows when a flex fan will fail:

> [O]nce the crack starts, it becomes an ongoing process of crack growth under the driving forces. So if I were to reach under a single fan and crack them all at the outset and then start my test, they would all fail in a predictable manner. But since some of them can go many thousands of miles before the first crack starts, they all get displaced in time as to when you see them fail.

Plaintiff's Additional SMF ¶ 160; Quesnel Dep. at 232-33.[45]

Tests performed by the defendants did not examine the area under the fan's reinforcing cap. Plaintiff's Additional SMF ¶ 161; Jorgensen Dep. at 106-07. Although strain gauges could not have been placed under the reinforcing cap, calculations could have been made from the point of the strain gauge to the point of failure. Plaintiff's Additional SMF ¶ 161; Jorgensen Dep. at 107-08.[46] GMC and/or Canadian Fram did not conduct the "City Cooling Test" on the 336032 flex fan. Plaintiff's Additional SMF ¶ 162; Defendants' Reply SMF ¶ 162. The City Cooling Test was conducted only on the Camaro fan, resulting in its being recalled. *Id*.[47] GMC reached faulty conclusions regarding safety factors because the endurance limit used was higher than good engineering would dictate. Plaintiff's Additional SMF ¶ 163; Jorgensen Dep. at 113. In contrast, Jorgensen made at least one hundred calculations to determine the validity of the life characteristic of this fan during the endurance limit.

---

[44] The defendants' objection to this statement on the ground that it constitutes irrelevant hearsay about immaterial collateral events, *see* Defendants' Reply SMF ¶ 157, is overruled. With respect to the hearsay component of the objection, Quesnel personally examined, and formed his own opinion regarding, the fans in the listed cases. *See* Quesnel Dep. at 216-18. In any event, an expert may rely on otherwise inadmissible hearsay of a type reasonably relied on by experts in the field. *See, e.g.*, *Corey*, 207 F.3d at 91. With respect to the relevance component, the similarity of earlier fan failures to the instant failure is a subject of dispute; however, crediting the plaintiff's engineering experts' view of the matter, as I must for purposes of the instant motion, the earlier fan failures are indeed relevant to the instant failure. The defendants alternatively deny this statement, *see* Defendants' Reply SMF ¶ 157; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[45] To the extent the plaintiff misquotes Quesnel's deposition testimony, I have corrected it. The defendants deny this statement, *see* Defendants' Reply SMF ¶ 160; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[46] The defendants deny paragraph 161, *see* Defendants' Reply SMF ¶ 161; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[47] The defendants qualify paragraph 162, asserting that both GMC and Canadian Fram conducted appropriate testing, *see* Defendants' Reply SMF ¶ 162; however, this is a disputed point, *see, e.g.*, Plaintiff's Additional SMF ¶ 161.

Plaintiff's Additional SMF ¶ 163; Jorgensen Dep. at 124, 129.[48] GMC recalled the flexible radiator

fan used in 1975 Camaros because of fatigue failures resulting from high-stress conditions at low

speed or low idle under certain engine operating conditions. Plaintiff's Additional SMF ¶ 171;

Defendants' Reply SMF ¶ 171.[49]

All 336032 flex fans were sold by Canadian Fram exclusively to GMC. Defendants' SMF

¶ 70; Plaintiff's Opposing SMF ¶ 70. Canadian Fram never sold 336032 flex fans to the public at any

time. *Id.* All 336032 flex fans were distributed by GMC either as original equipment (attached to

new vehicles) or as original equipment service parts (distributed by GMC through its network of parts

warehouses and dealerships). *Id.* ¶ 71. The fan involved in this case was not designed, manufactured,

sold or in any way placed into commerce by either Honeywell International (formerly AlliedSignal,

Inc.) or Honeywell Canada (formerly AlliedSignal Canada, Inc.). Defendants' SMF ¶ 72; Loucks Aff.

¶ 16.[50] In 1988 AlliedSignal, Inc. sold the stock of its indirect subsidiary, Bendix Engine Components,

Ltd. (formerly Canadian Fram) to Siemens Corporation. Defendants' SMF ¶ 73; Plaintiff's Opposing

SMF ¶ 73. As part of that transaction, potential liabilities relating to products manufactured before the

business was sold were assigned to AlliedSignal Canada, Inc. (now Honeywell Canada). *Id.*

### III. Analysis

The plaintiff seeks to hold all three defendants liable on theories of (i) strict liability

(defective condition rendering the 1979 GMC Jimmy unusually dangerous to the plaintiff, as well as

failure to warn) (Count I), *see* Complaint ¶¶ 20-26, (ii) breach of an express warranty of

---

[48] The defendants deny this statement, *see* Defendants' Reply SMF ¶ 163; however, I view the cognizable evidence in the light most favorable to the plaintiff, as nonmovant.

[49] The defendants qualify this statement, asserting (to the extent their qualification is supported by the citation given) that it was later determined that when flex fan Part No. 354327 was installed on the 1975 Camaro equipped with the new production 350 C.I.D. engine and air conditioning, a coincidence of crankshaft tortional vibration, excessive fan excitation and fan-blade resonance increased the blade amplitude. Defendants' Reply SMF ¶ 171; Exh. A to Plaintiff's Opposing SMF at Bates Stamp No. 00129.

[50] The plaintiff purports to deny this statement, *see* Plaintiff's Opposing SMF ¶ 72; however, he relies on a citation to the GMC Answer that does not effectively controvert the underlying statement inasmuch as GMC admitted that AlliedSignal, AlliedSignal (*continued on next page*)

merchantability (Count II), *see id*. ¶¶ 27-29, (iii) breach of the implied warranty of merchantability (Count III), *see id*. ¶¶ 30-32, (iv) misrepresentation (Restatement (Second) of Torts § 402B) (Count IV), *see id*. ¶¶ 33-35, (v) negligence (Count V), *see id*. ¶¶ 36-39, and (vi) negligent failure to warn (Count VI), *see id*. ¶¶ 40-44.  He seeks, *inter alia*, punitive damages.  *See id*. ¶¶ 45-50 (Count VII).

All three defendants seek summary judgment as to all claims against them on the bases of (i) substantial change in the condition of the fan after it left control of the manufacturer and seller, (ii) product misuse and (iii) spoliation of the evidence (loss of both the separated blade and the water pump to which it was attached).  *See* Defendants' S/J Motion at 10-23.  In addition, Honeywell International alternatively seeks summary judgment as to all claims against it on the ground that it did not design, manufacture or place this or any other flex fan into commerce at any time.  *See id*. at 23-26. There is no dispute that, in this diversity case, Maine law applies.  *See, e.g., id*. at 10-11; Plaintiff's Opposition to Defendants' Joint Motion for Summary Judgment ("Plaintiff's S/J Opposition") (Docket No. 52) at 4.  For the reasons that follow, I conclude that the defendants' motion for summary judgment should be granted insofar as it concerns Honeywell International and otherwise denied.

## A.  Substantial Change in Condition of Fan

The defendants' first line of attack on the plaintiff's case – their "substantial change" argument – encompasses three separate sub-points.  *See* Defendants' S/J Motion at 10-16.  In essence, the defendants contend that the plaintiff cannot meet his burden of proving (i) for purposes of Maine's strict-liability statute, 14 M.R.S.A. § 221, that the fan reached him "without significant change in the condition in which it [was] sold[,]" (ii) for purposes of both his strict-liability and negligence theories, that defective design or negligence, if any, proximately caused his injuries, and (iii) for purposes of both his strict-liability and negligence theories, that the chain of proximate causation (if

---

Canada, Honeywell "and/or their predecessors" designed, manufactured, sold and distributed the fan, *see* GMC Answer ¶ 12.

any) was unbroken by a superseding, intervening cause.  *See id*.  For much the same reasons, none of these sub-points carries the day.

### 1.  Strict-Liability Statute, 14 M.R.S.A. § 221

Maine's strict-liability statute provides:

> One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold.  This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

14 M.R.S.A. § 221.

In *Marois v. Paper Converting Mach. Co*., 539 A.2d 621 (Me. 1988) – a case in which the defendant manufacturer contended that addition of an extra "jog button" to a paper-rewinding machine relieved it of strict liability for the plaintiff's injuries, *see id*. at 623 – the Law Court had occasion to construe the phrase "without significant change in the condition in which it is sold," holding:

> We agree with those courts that do not regard a change in the manufacturer's product as significant unless the change relates to the *essential features* and to the safety of the product.

> Although the courts in other jurisdictions are not in entire agreement, we conclude that the best rule is that even if a substantive change is made in a product, the manufacturer will not be relieved of liability unless the change was an unforeseen and intervening proximate cause of the injury.  Accordingly, if the jury finds that the modification was, or should have been, foreseen and (a) is a contributing cause of the injury, or (b) enhances the injury, or (c) increases the likelihood of its occurrence, the manufacturer will not be relieved of liability.

*Id.* at 624 (citations omitted); *see also, e.g., Hollinger v. Wagner Mining Equip. Co*., 667 F.2d 402, 407 (3d Cir. 1981) ("[I]t is obvious that not every change in a vehicle will relieve a manufacturer of liability under section 402A of the Restatement (Second) of Torts.  For a change to be considered

'substantial' for this purpose, the change must have some causal connection with the accident.") (citation and internal quotation marks omitted).

The defendants argue that, in this case, the plaintiff cannot carry his burden of showing a lack of "significant change" inasmuch as the flex fan in issue not only had endured severe mechanical damage but also had been attached to the wrong vehicle, the wrong engine and a damaged water pump. *See* Defendants' S/J Motion at 11. The defendants point out that, per their expert Loucks, those mechanical stresses and mismatches caused the fan's ultimate failure. *See id.* They contend that no reasonable manufacturer could have foreseen that such an abused, broken and mismatched fan would remain in service, particularly in view of GMC's warnings against continued use of damaged fans. *See id.* at 10-11.

Nonetheless, the plaintiff counters with his own factual and expert evidence on the basis of which a reasonable trier of fact could conclude that some of the asserted misusage did not occur and, in any event, as in *Marois*, even if it all occurred, those changes were not "significant" for purposes of section 221. This includes evidence that (i) GMC installed the flex fan in question as original equipment on the plaintiff's 1979 GMC Jimmy (and thus it was not mismatched), *see* Plaintiff's Additional SMF ¶ 77; Complaint ¶ 15; GMC Answer ¶ 15; (ii) the fan was not improperly bolted to the water pump, *see* Plaintiff's Additional SMF ¶ 110; Bisco Dep. at 28; (iii) in the view of the plaintiff's experts (Quesnel, Jorgensen and Oddy), to the extent the fan sustained mechanical damage before failing and was used with a different engine and/or in a different vehicle, those occurrences were foreseeable to the defendants, *see* Plaintiff's Additional SMF ¶¶ 138-141; Quesnel Aff. ¶¶ 35-36; Oddy Aff. ¶ 10; Quesnel Dep. at 165-67; Jorgensen Dep. at 71; (iv) in any event, per Quesnel and Jorgensen, neither the mechanical damage nor a car or engine mismatch (if any) caused the fan blade's separation, *see* Plaintiff's Additional SMF ¶¶ 129, 135; Jorgensen Aff. ¶ 3; Quesnel Dep. at 40; and

(v) the failure resulted from the faulty design concept of employing a flexible-blade fan to cool an automotive engine, which, in the view of Quesnel and Jorgensen, is an inherently unsafe usage that eventually will cause blade fatigue and separation, *see* Plaintiff's Additional SMF ¶¶ 143-44; Quesnel Aff. ¶ 29; Jorgensen Aff. ¶ 7(a)-(b).  The plaintiff also adduces evidence from which a trier of fact reasonably could conclude that (i) GMC did not warn owners (as opposed to service personnel) of the dangerousness of the flex fan, *see* Plaintiff's Additional SMF ¶ 125; Zych Dep. at 93; and (ii) it was reasonably foreseeable to the defendants that consumers would work on their own vehicles, *see* Plaintiff's Additional SMF ¶ 139; Oddy Aff. ¶ 10.

The plaintiff having adduced sufficient evidence to meet his burden of proving that the fan reached him without "significant change," the defendants are not entitled to summary judgment on this basis.  *See, e.g., Hollinger*, 667 F.2d at 408 (summary judgment wrongly granted in defendant's favor in case in which evidence raised factual question concerning "an essential ingredient of substantial change, a causal connection between the modification [removal of a manual horn from a scooptram] and the resulting injury[.]"); *Fisher v. Walsh Parts & Serv. Co.,* 296 F. Supp.2d 551, 563 (E.D. Pa. 2003) (questions whether post-delivery modification constituted "substantial change" and, if so, whether change was foreseeable are for factfinder "unless the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change") (applying Pennsylvania law).

## 2.  Proximate Cause

As the defendants point out, *see* Defendants' S/J Motion at 12, proximate cause is an essential element of both strict-liability and negligence actions, *see, e.g.*, *Ames v. Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992) ("In order to recover under either a product liability or a negligence theory, it is essential that the plaintiff prove that a product's defective design or the defendant's negligent

conduct proximately caused the plaintiff's injuries."). A cause is "proximate" if "in natural and continuous sequence, unbroken by an efficient intervening cause, [it] produces the injury and without [it] the result would not have occurred." *Id*. (citation and internal quotation marks omitted). As the defendants further underscore, *see* Defendants' S/J Motion at 12, a plaintiff "must show more than a mere possibility of proximate cause; evidence that requires speculation or conjecture by the factfinder entitles [a defendant] to judgment as a matter of law, thereby permitting a proper grant of a summary judgment[,]" *Johnson v. Carleton*, 765 A.2d 571, 575 (Me. 2001) (citation and internal quotation marks omitted).

The defendants posit that the plaintiff can offer only speculation and guesswork that a design defect caused his injures in view of (i) the severely damaged condition of the fan, (ii) its use in the wrong vehicle with the wrong engine, attached to a defective water pump, (iii) its probable operation with air conditioning and a mismatched shroud, and (iv) the existence of "vast blank spaces" concerning its maintenance and operational history. *See* Defendants' S/J Motion at 13.

Nonetheless, as noted above, the plaintiff both (i) controverts certain of the defendants' evidence as to extent of abuse and misuse of the fan and (ii) offers expert evidence (built upon a sufficiently reliable foundation to pass *Daubert* muster) that, to a reasonable degree of engineering certainty, there is indeed a direct causal linkup between defective design and the plaintiff's injuries. This suffices to avert summary judgment in the defendants' favor. *See, e.g., Jiminez v. Dreis & Krump Mfg. Co.,* 736 F.2d 51, 55 (2d Cir. 1984) ("The affidavit of appellant's expert was sufficient to raise a question of fact as to whether the injury was caused by a failure in the pneumatic activating device or by a mechanical failure in the clutch, brake, or other machine part. In short, the proximate cause of the injury was a disputed fact. Since the . . . 'substantial alteration' doctrine exculpates a defendant only where the alteration clearly was the proximate cause of the injury, we hold that

43

summary judgment was inappropriate[.]") (applying New York law); *Braverman v. Kucharik Bicycle Clothing Co*., 678 N.E.2d 80, 84 (Ill. App. Ct. 1997) ("Illinois decisions have consistently held a plaintiff's proof sufficient to present a triable factual issue when the plaintiff has produced expert testimony that the defendant's product was defective when it left the defendant's control and was a proximate cause of the plaintiff's injury.") (citation and internal quotation marks omitted).

### 3. Superseding, Intervening Cause

In related vein, the defendants next assert that the plaintiff cannot prove that any chain of proximate cause was unbroken by a superseding, intervening cause. *See* Defendants' S/J Motion at 13-16; *see also, e.g., Ames*, 617 A.2d at 561 ("[T]he mere occurrence of an intervening cause does not automatically break the chain of causation stemming from the original actor's conduct. In order to break that chain, the intervening cause must also be a superseding cause, that is, neither anticipated nor reasonably foreseeable."). They contend that (i) when a long time has passed between the date of a product's manufacture and the date of injury, it is much less likely that the injuries were proximately caused by the product's original condition, (ii) when a product has exceeded its useful life or been kept in ill repair, it is much less likely that any action by the manufacturer proximately caused damages, (iii) when a third party, by unforeseeably altering a product, directly affects its safety, the original manufacturer is discharged from liability as a matter of law, and (iv) when a product is used abnormally or mishandled, the original manufacturer is exonerated. *See* Defendants' S/J Motion at 14-15.

With this as backdrop, they argue that, in this case, "the chain of proximate causation leading from the original condition of the fan to [the plaintiff's] accident was interrupted by: (1) significant mechanical damage, (2) causing a change in the fan's resonant frequency; (3) continued use of the damaged fan in derogation of warnings; (4) someone's poor attempt to disguise and cover up the fan's

damaged, fractured condition with spray paint; (5) attachment of the fan to a broken water pump; (6) use of the fan with an incorrect engine, (7) thereby subjecting the fan to firing pulses it was never intended to see; (8) operation of the fan in the wrong vehicle; (9) probable use of the fan with air conditioning, a use for which the fan was neither designed nor intended; and (10) exposure of the fan to this sequence of insults for one-quarter of a century!"  *Id*. at 15-16.

The plaintiff again successfully rebuffs this variation on the theme of "substantial modification" with a combination of factual and expert evidence (i) calling into question the extent of damage to and misuse of the fan (*e.g.*, whether it was original to the 1979 GMC Jimmy) and (ii) setting forth expert opinion that a faulty design concept, rather than subsequent modifications, led the fan blade to separate and fly out of the plaintiff's vehicle at a high rate of speed, causing him grievous injury.  Moreover, the plaintiff adduces evidence indicating that (i) the alleged alterations (*e.g.*, use of a flex fan in a different vehicle) were reasonably foreseeable by the defendants, (ii) the defendants knew or reasonably should have known that consumers worked on their own vehicles, and,  (iii) although GMC supplied flex-fan warnings in service  manuals, it did not supply them in owner manuals.   A jury crediting that  evidence could not find that those  modifications constituted "superseding" causes of the plaintiff's injuries.  *See, e.g., Pryor v. Lee C. Moore, Corp*., 262 F.2d 673, 674-75 (10th Cir. 1959) (trial court improperly directed verdict for defendant-manufacturer on ground that fifteen years' safe usage of derrick foreclosed probability it was defectively or negligently made; despite years of safe usage and lack of direct evidence that defective weld proximately caused derrick's collapse, jury reasonably could infer from physical facts of collapse that such proximate cause existed); *Mickle v. Blackmon*, 166 S.E.2d 173, 190 (S.C. 1969) ("We readily concede that the passage of thirteen years between the marketing of a product and its injury-producing failure is a formidable obstacle to fastening liability upon the manufacturer.  However, it may reasonably be

inferred in this case that the advanced age of the ball was coincidental with its failure rather than the cause of it[.]").  Summary judgment on this basis accordingly is unwarranted.

## B.  Product Misuse

The defendants alternatively invoke the affirmative defense of "product misuse" as a bar to liability in this action.  *See* Defendants' S/J Motion at 16-20; *see also, e.g.*, 63A Am. Jur.2d *Products Liability* § 1406.  "Misuse has been defined as a use of a product for a purpose neither intended nor reasonably foreseeable by the manufacturer."  63A Am. Jur.2d *Products Liability* § 1413 (footnote omitted); *see also, e.g., Erickson v. Monarch Indus., Inc*., 347 N.W.2d 99, 110 (Neb. 1984) (manufacturer "not obligated to design a product safe for an unforeseeable misuse").  Misuse can encompass not only "the use of a product for an improper purpose and use in an improper manner" but also disregard of "reasonable care and maintenance known to be necessary for the continued safety of a product."  63A Am. Jur.2d *Products Liability* § 1413 (footnotes omitted).  The obvious corollary to these precepts is that, to the extent the asserted misuse was reasonably foreseeable, it is not a bar to liability.  *See, e.g., Cigna Ins. Co. v. OY Saunatec, Ltd*., 241 F.3d 1, 18 (1st Cir. 2001) (trial court did not err in declining to give product-misuse-defense instruction in case in which there was ample evidence at trial that accidental or even intentional draping of a towel on a sauna heater was foreseeable; "If the club or its members had used the sauna heater to grill steaks, an example cited during the trial, we would have no difficulty concluding that such a 'misuse' could not be foreseen by a sauna manufacturer.") (applying Massachusetts law).

"Misuse provides a complete bar to a plaintiff's recovery where it is established that the plaintiff's misuse, and not a defect in the product, is the cause of the injury."  63A Am. Jur.2d *Products Liability* § 1426 (footnote omitted); *see also, e.g., White v. ABCO Eng'g Corp.,* 221 F.3d 293, 303, 305 (2d Cir. 2000) (noting that, under New Jersey law, "material alteration alone is not a

defense; rather, material alteration is only a defense when the alteration makes it impossible to conclude that a defect at the time of manufacture was a cause of the injury giving rise to the suit"; holding that trial court erred in granting summary judgment in favor of defendant when triable issue existed whether alteration to machine constituted proximate cause of accident); *LaPlante v. American Honda Motor Co.*, 27 F.3d 731, 737 (1st Cir. 1994) (trial court committed reversible error in declining to give Honda's subsequent-alteration defense; rational jury, if presented with defense, "could have found that any or all of the alleged alterations or modifications [which included consequences of inadequate maintenance of Honda all-terrain vehicle] 'substantially caused' plaintiff's injuries") (applying Rhode Island law).

The defendants argue that (i) although Maine has yet to recognize a product-misuse defense, it likely would do so in a case such as this, (ii) the plaintiff's obviously bent fan was used in contravention of warnings cautioning against the continued use of damaged fans, was installed in the wrong (air-conditioned) vehicle and was attached to the wrong engine, and (iii) none of the defendants could have foreseen misuse this gross and extensive. *See* Defendants' S/J Motion at 17-20.

As an initial proposition, it is doubtful that Maine would embrace the affirmative defense of product misuse. In support of their assertion that the Law Court has signaled friendliness to such a defense, the defendants rely heavily on *Hatch v. Maine Tank Co.*, 666 A.2d 90 (Me. 1995), a products-liability case in which the Law Court observed:

> [T]he sump pump was installed and used in an environment where it never should have been used at all, in water contaminated with gasoline. That danger was obvious, was known to the parties, and, more importantly, was continuous for several months. [The manufacturer] cannot be held liable for the pump's use on the basis of foreseeability. The pump was not used in these circumstances because of necessity, lack of a safe apparent alternative, or through momentary inadvertence. Rather, it was deliberately misused.

*Hatch*, 666 A.2d at 95 (citation and internal quotation marks omitted). Nonetheless, context is important: In weighing the correctness of the trial court's jury instructions in this duty-to-warn strict-liability case, the Law Court adverted to foreseeability as a basic element of a plaintiff's case. *See id.* at 94; *see also, e.g., Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 197 (Me. 1990); *Marois*, 539 A.2d at 624 (cited in *Hatch*, 666 A.2d at 94). Thus, rather than signaling that the Law Court likely would adopt product misuse as an affirmative defense, *Hatch* suggests that the Law Court would find such a defense superfluous (as have other jurisdictions). *See, e.g.,* 63A Am. Jur. 2d *Products Liability* § 1406 ("[A] few jurisdictions consider the question of misuse to be part of the plaintiff's case in a products liability action, on the theory that since questions of misuse of the product are involved in the determination whether the product was defective and whether a defect was the proximate cause of the injury, and these are elements that must be proved by the plaintiff, misuse is not an affirmative defense; misuse is a 'defense' only in the sense that proof of misuse negates one or more essential elements of a plaintiff's case, and may thereby defeat recovery.") (footnotes omitted).[51]

In any event, even assuming *arguendo* that Maine would embrace a product-misuse affirmative defense, there is a triable issue whether the defendants can prove that defense in this case, the plaintiff having adduced evidence from which a jury could find that (i) the plaintiff's fan was not as abused and misused as the defendants contend, (ii) the alleged abuse/misuse was reasonably foreseeable, and (iii)

---

[51] The defendants also cite *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144 (Me. 1983), for the proposition that the Law Court would recognize a product-misuse defense. *See* Defendants' S/J Motion at 17-18. In *Schiavi*, the Law Court rebuffed the plaintiff's complaint that the trial court had erred in instructing the jury on "intended use" rather than "foreseeable use" and "foreseeable misuse." *Schiavi*, 462 A.2d at 1149-50. The Law Court noted that the issue of foreseeable use or misuse had not been generated at trial, there having been no evidence that the product in issue (a trailer) was used in any way other than intended. *See id.* at 1150. It went on to observe, in any event: "As we construe the concept of 'foreseeable misuse,' it is not intended as a justification or condonation of a plaintiff's possible contributory negligence." *Id.* For that proposition it cited *Orr v. First Nat'l Stores, Inc.*, 280 A.2d 785 (Me. 1971), *see id.*, in which (as in *Hatch*, *Marois* and *Lorfano*) it had conceptualized "foreseeable misuse" as bearing on the question whether the plaintiffs had made out their basic case, *see Orr*, 280 A.2d at 792-94 (plaintiffs had generated jury issue whether, given foreseeable misuse of store premises by child invitees, store had negligently maintained premises, causing injury to plaintiffs' child). The defendants' reliance on *Schiavi*, like their reliance on *Hatch*, accordingly is misplaced. Neither case reasonably can be read as signaling a sea change in Maine law in the form of a willingness to adopt product misuse as an affirmative defense.

the alleged misuse/abuse did not cause the accident.  The defendants accordingly fall short of demonstrating entitlement to summary judgment on a product-misuse theory.

### C.  Spoliation of Evidence

The defendants next seek dismissal of the plaintiff's entire case with prejudice or, alternatively, preclusion of his introduction of any evidence regarding proximate cause, on the basis of spoliation of evidence.  *See* Defendants' S/J Motion at 20-23.  They complain that (i) the plaintiff lost not only the blade that separated from the fan but also the water pump to which the fan was attached, and (ii) Bisco removed the fan from the engine before any defense expert could examine the condition of the fan as mounted, the water pump, the torque readings on the bolts or the tension on the several belts associated with the fan, or determine whether the fan had been mounted with the necessary lock washers in place.  *See id*. at 20.  As a result, the defendants contend, the plaintiff or his agents effectively destroyed the scene of the accident, preventing them from showing that the fan was improperly mounted or that the separated blade had the same heavy mechanical damage as the remaining six blades.  *See id* at 20-21.  The defendants complain that they also have been precluded from exhibiting to the jury the extent of deterioration of the water pump and are left only with Bisco's self-serving minimization of that damage.  *See id*. at 21.

The plaintiff rejoins that the requested harsh sanctions are inappropriate inasmuch as (i) the defendants have failed to produce any evidence of malice, or intent to interfere with the lawsuit, in connection with the losses, and (ii) the lost evidence is irrelevant or, at best, collateral.  *See* Plaintiff's S/J Opposition at 15-20.  I agree that neither requested sanction is warranted in these circumstances.

As this court has observed:

> The goals of the spoliation doctrine are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct,

> particularly deliberate conduct, leading to such loss of evidence.  Sanctions for spoliation may include dismissal of the case, the exclusion of evidence, or a jury instruction on the spoliation inference.
>
> The First Circuit considers the prejudice to the non-offending party and the degree of fault of the offending party.  Of these, the First Circuit has implied that it weighs prejudice more heavily than bad faith.

*Driggin v. American Sec. Alarm Co.*, 141 F. Supp.2d 113, 120 (D. Me. 2000) (citations, internal quotation marks and footnotes omitted).

The defendants point out that a finding of bad faith is not an essential prerequisite to imposition of sanctions for spoliation.  *See* Defendants' S/J Motion at 21.  This is true as a general proposition.  *See, e.g., Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997) ("[B]ad faith is not essential.  If . . . evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence.").  Nonetheless, "the most severe sanction of dismissal should be reserved for cases where a party has maliciously destroyed relevant evidence with the sole purpose of precluding an adversary from examining that relevant evidence."  *Elwell v. Conair, Inc.*, 145 F. Supp.2d 79, 88 (D. Me. 2001) (citation and internal quotation marks omitted).  Here, the defendants seek not only the dismissal sanction itself but also, in the alternative, a sanction that, as a practical matter, would accomplish essentially the same goal, disabling the plaintiff from proving an essential element of his case.

The defendants' evidence falls well short of laying a foundation for the imposition of either severe sanction sought.  From all that appears, the plaintiff never had an opportunity to "lose" or otherwise mishandle the separated blade.  There is no evidence that anyone has seen it since it detached and struck him in the face.  At that moment, the plaintiff understandably was bent on seeking immediate medical assistance: He left the truck running, keys in the ignition, as he went to seek aid.  When Bisco arrived at the plaintiff's home the following day he noticed the fan blade was missing and

looked for it without success.  Subsequently, the plaintiff and other family members engaged in fruitless searches for the missing blade.

Nor can the plaintiff fairly be said to have harbored any sort of malicious intent with respect to the removal of the fan and water pump from the GMC Jimmy or the disposal of the pump.  The day following the accident, Bisco dropped by the plaintiff's home to see what he could do to help.  He noticed the key still in the ignition of the GMC Jimmy in the "on" position, from which he deduced that the vehicle had either stalled or run out of gas.  He removed the fan and the water pump and replaced them because they were broken.  There is no evidence that the plaintiff directed Bisco to do these things or was even contemporaneously aware he was doing them.  In any event, one cannot draw a reasonable inference on these facts that Bisco's actions were designed to frustrate any potential adversaries in yet-to-be-brought litigation.

To the extent that, in these circumstances, imposition of such harsh sanctions might yet be justified by the existence of "severe prejudice[,]" *see Driggin*, 141 F. Supp.2d at 123, the defendants fall short of making such a showing.  The defendants have had, and have availed themselves of, the opportunity to examine both the fan and the plaintiff's 1979 GMC Jimmy. *See, e.g*., Defendants' SMF ¶¶ 13, 31, 44.  The Honeywell defendants' expert, Loucks, noted the presence of extensive damage to the fan as a whole, including to a remnant of the missing blade (Blade No. 2). *See id.* ¶ 68(G, I, J-L). This then positioned him to opine that because such damage would alter the fan's original geometry and resonant frequency, that damage (and/or other asserted abuses and misuses) "most probably caused" the fatigue-induced separation of Blade No. 2. *Id*. ¶ 68(H), (J).

With respect to the water pump, while the defendants state that, as a result of Bisco's failure to measure the torque on the bolts attaching the fan to the pump, "it is unknown whether this fan was ever properly installed in the first place," *id*. ¶ 43, they are able to offer evidence from which a trier of fact

reasonably could deduce that at some point prior to the accident the fan was not properly attached to the pump. This includes (i) Loucks' observation that the washer marks around one of the mounting-bolt holes on the fan appeared lighter than the washer marks surrounding the other three, indicating that the fan at one time might have been mounted to the pump by only three bolts rather than four, *see id.* ¶ 30; (ii) Bisco's testimony that, after the accident, he removed the fan and its associated water pump from the truck because the water-pump bearings had "worn out," causing the fan to "wobble around," *id*. ¶ 37; (iii) Loucks' testimony that failed water-pump bearings can cause a fan to operate out of balance and, conversely, out-of-balance operation of a fan can burn out bearings in the water pump, *see id*. ¶ 39; and (iv) Loucks' observation that lifting of the reinforcing caps on most of the blades indicates that they were oscillating heavily while the fan operated in an unbalanced condition, *see id.* ¶ 68(I).[52]

While, of course, it would have been preferable for the defendants to be able themselves to examine (and show to the jury) the missing blade and pump, it is not fair to say that they are thereby "prevented" from advancing their theories that (i) the missing blade was heavily damaged, and (ii) the fan was improperly mounted to the pump. Nor do the blade and pump theories by any means encompass the entire universe of their defense, which includes assertions that the flex fan in question was installed in the wrong vehicle with the wrong engine, *see id*. ¶¶ 13-18, 32-35, and suffered additional mechanical damage as a result of operation with a mismatched shroud and a probable frontal collision, *see id*. ¶¶ 62, 65 – circumstances that in Loucks' and GMC expert Hakim's opinion also could have led to the fan's failure, *see id*. ¶¶ 68-69.[53]

---

[52] Bisco also testified that the bearings and seal were worn out from the fan operating out of balance after the blade had broken off. *See* Plaintiff's Additional SMF ¶ 111. However, the defendants counter with testimony of Loucks (described above) from which a jury reasonably could find that the bearings and seal were worn (at least to some degree) prior to the accident.

[53] The plaintiff argues, in part, that the missing evidence is irrelevant because, viewing the evidence in the light most favorable to himself as nonmovant, his experts' opinions make clear that is the case. *See* Plaintiff's S/J Opposition at 16-17. This stance conflates (*continued on next page*)

For all of the foregoing reasons, the defendants fail to make a persuasive case for dismissal of the instant action, or preclusion of the plaintiff from presenting any evidence on the issue of proximate cause, on spoliation grounds.  In *Driggin*, in which the court similarly rejected as inappropriately harsh a defendant's requested spoliation sanctions of dismissal of the case or, alternatively, preclusion of the plaintiffs' expert's testimony, the court observed:

> It is important to note, however, that my findings with respect to sanctions for spoliation are preliminary.  I merely conclude that on the facts presented at this stage in the proceeding the relatively severe sanctions that Goodale has requested are not warranted.  I do not rule out the possibility that these or other sanctions – such as a negative inference jury instruction or more targeted exclusion of certain aspects of [plaintiffs' expert's] testimony – may be appropriate at a later stage.

*Driggin*, 141 F. Supp.2d at 123.  I recommend that the court likewise treat the instant disposition as preliminary.

### D.  Bid of Honeywell International for Summary Judgment

Defendant Honeywell International finally seeks summary judgment as to all claims against it on the bases that (i) it did not design, manufacture or distribute the flex fan but rather was at most an indirect shareholder in Canadian Fram until it sold that stock in 1988, and (ii) a stockholder is not liable for the torts or other obligations of a corporation in which it owns stock, *see* Defendants' S/J Motion at 25-26; *see also* Defendants' SMF ¶¶ 70, 73; Plaintiff's Opposing SMF ¶¶ 70, 73; 13-C M.R.S.A. § 623(2) ("Unless otherwise provided in a corporation's articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation except that the shareholder may become personally liable by reason of the shareholder's acts or conduct.");

---

summary-judgment and spoliation standards of analysis.  For purposes of assessing whether a movant has suffered prejudice warranting spoliation sanctions, the court must consider not only whether the evidence is relevant to the nonmovant's theory of the case but also (more importantly) whether it is relevant to the movant's theory (as a result of which its loss might cause prejudice).  *See, e.g., Vazquez-Corales v. Sea-Land Serv., Inc.*, 172 F.R.D. 10, 12 (D.P.R. 1997) (observing that plaintiffs offered no authority for "patently unsupportable" proposition that evidence was relevant for purposes of spoliation analysis only when necessary to support plaintiffs' theory of liability).  Thus, although the plaintiff controverts a great deal of the defendants' evidence, I have nevertheless (*continued on next page*)

*LaBelle v. Crepeau*, 593 A.2d 653, 655 (Me. 1991) (a principal benefit of the corporate form "is limited liability for shareholders").

The plaintiff disputes none of the foregoing but, rather, asserts that it is a factual determination, not appropriate for resolution on summary judgment, whether Honeywell International can be held liable for the actions of its wholly owned subsidiary, Honeywell Canada, on theories of either absence of an arms' length relationship or the sham nature of the separate corporate forms. *See* Plaintiff's S/J Opposition at 21; *see also, e.g., Advanced Constr. Corp. v. Pilecki,* 901 A.2d 189, 194-95 (Me. 2006) ("We allow the corporate veil to be pierced when the party seeking to do so establishes that the other party abused the privilege of a separate corporate identity and an unjust or inequitable result would occur if the court recognized the separate corporate existence.") (citation and internal quotation marks omitted).

The trouble – as Honeywell International correctly observes, *see* Defendants' S/J Reply at 8-9 – is that, in the context of summary judgment, a factual dispute cannot exist in thin air. The plaintiff fails to proffer any evidence from which a reasonable trier of fact could conclude that piercing of Honeywell International's corporate veil is appropriate. That is fatal to his bid to stave off summary judgment as to that defendant. *See, e.g., Triangle Trading*, 200 F.3d at 2 (once moving party has made preliminary showing that no genuine issue of material fact exists, nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue") (citation and internal punctuation omitted).

### IV.  Conclusion

For the foregoing reasons, I **GRANT** the defendants' motion to strike Hall; **GRANT** in part and **DENY** in part their motion to exclude insofar as it concerns Oddy and **DENY** it insofar as it concerns

---

considered that evidence for purposes of assessing the extent of prejudice to them flowing from the absence of the fan blade and water (*continued on next page*)

Jorgensen and Quesnel; and recommend that their motion for summary judgment be **GRANTED** as to all

claims against Honeywell International and otherwise **DENIED**.

### <u>NOTICE</u>

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 15th day of November, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

---

pump and Bisco's removal of those items from the GMC Jimmy.